In re CELERA CORPORATION SHAREHOLDER LITIGATION.

BVF Partners L.P., Objector Below–Appellant,

v.

New Orleans Employees' Retirement System, Plaintiff Below–Appellee,

and

Richard H. Ayers, Jean–Luc Belingard, Peter Barton Hutt, Gail M. Naughton, Kathy Ordoñez, Wayne I. Roe, Bennett M. Shapiro, Celera Corporation, Quest Diagnostics Incorporated and Sparks Acquisition Corporation, Defendants Below–Appellees.

No. 212, 2012.

Supreme Court of Delaware.

Submitted: Oct. 24, 2012.

Decided: Dec. 27, 2012.

Bruce L. Silverstein, Esquire (argued), Martin S. Lessner, Esquire, Richard J. Thomas, Esquire, Emily V. Burton, Esquire, Benjamin Z. Grossberg, Esquire, Thomas E. Williams, Esquire, of Young Conaway Stargatt & Taylor LLP, Wilmington, Delaware, for Appellant BVF Partners L.P.

Stuart M. Grant, Esquire (argued) Michael J. Barry, Esquire, John C. Kairis, Esquire, of Grant & Eisenhofer P.A., Wilmington, Delaware; Of Counsel Mark Lebovitch, Esquire, Jeremy Friedman, Esquire, of Berstein Litowitz Berger & Grossmann LLP, New York City, New York; Marlon E. Kimpson, Esquire, William S. Norton, Esquire of Motley Rice LLC, Mt. Pleasant, South Carolina, for Appellee New Orleans Employees' Retirement System.

Gregory P. Williams, Esquire, Kevin M. Gallagher, Esquire, of Richards, Layton & Finger, P.A., Wilmington, Delaware; Of Counsel Alan S. Goudiss, Esquire, Brian H. Polovoy (argued), Esquire, Michael S. Carucci, Esquire, of Shearman & Sterling

LLP, New York City, New York, for Appellees Quest Diagnostics Incorporated, Spark Acquisition Corporation, and Celera Corporation.

Kevin G. Abrams, Esquire, of Abrams & Bayliss LLP, Wilmington, Delaware; Of Counsel Patrick E. Gibbs, Esquire, Andrew M. Farthing, Esquire, of Latham & Watkins LLP, Menlo Park, California, for Appellees Richard H. Ayers, Jean–Luc Belingard, William G. Green, Peter Barton Hutt, Kathy Ordoñez, Wayne I. Roe, and Bennett M. Shapiro.

Before HOLLAND, BERGER, JACOBS, and RIDGELY, Justices, and VAUGHN, President Judge,[1] constituting the Court en Banc.

RIDGELY, Justice:

Objector–Below/Appellant, BVF Partners L.P. ("BVF") appeals from a Court of Chancery certification of Plaintiff–Below/Appellee New Orleans Employees' Retirement System ("NOERS") as class representative in this action challenging the acquisition of Celera Corporation ("Celera") by Quest Diagnostics, Inc. ("Quest"). BVF also appeals from the Court of Chancery's approval of a class action settlement without an opt out right for BVF between NOERS and Defendants–Below/Appellees Richard H. Ayers, Jean–Luc Belingard, William G. Green, Peter Barton Hutt, Gail M. Naughton, Kathy Ordoñez ("Ordoñez"), Wayne I. Roe, Bennett M. Shapiro, Celera Corporation, Quest Diagnostics Incorporated, and Spark Acquisition Corporation ("Spark") (collectively "the defendants").

BVF contends that the Court of Chancery erred in certifying NOERS as the class representative, because NOERS lacked standing to represent the class.

BVF argues that when NOERS sold its stock in Celera on the public market—several days before the merger was actually consummated and nearly a year before the Court of Chancery certified the class—NOERS no longer had a legally cognizable stake in the outcome of the litigation. BVF further advances several other grounds for why the Court of Chancery erred in certifying NOERS as class representative, including that NOERS was uniquely susceptible to equitable defenses and was therefore an improper class representative.

In addition, BVF claims that the Court of Chancery erred in certifying the class as a non-opt-out class under Court of Chancery Rule 23(b)(1) and 23(b)(2). Alternatively, BVF contends that even if that certification was proper, the Court of Chancery should have exercised its discretionary powers to allow BVF to opt out of the class in order to pursue its individual claims for monetary damages against the defendants.

We agree with the Court of Chancery that NOERS has standing to represent the class. The settlement agreement executed between NOERS and the defendants broadly defines the class and NOERS falls within that broad definition. We decline to adopt a rule of law that a shareholder class representative in a breach of fiduciary duty action must own stock in the corporation continuously through the final class certification. As for BVF's other arguments regarding NOERS' certification as class representative, we find them unconvincing.

We conclude that the Court of Chancery did not abuse its discretion in certifying the class under Rule 23(b)(1) and (b)(2).

---

1. Sitting by designation pursuant to art. IV, § 12 of the Delaware Constitution and Supreme Court Rules 2 and 4.

We also conclude, however, that there is merit to BVF's claim that the Court of Chancery should have exercised its discretion to allow BVF to opt out of the shareholder class under the circumstances of this case. Balancing of Delaware's pro-settlement policy against concerns for due process raised by the record in this case requires this result. Accordingly, we affirm in part and reverse in part.

## FACTS AND PROCEDURAL HISTORY

BVF is a hedge fund that owns stock in Celera, which is a publicly traded Delaware corporation having its principal place of business in Alameda, California. Celera is a healthcare business that before the merger, had three primary business segments: lab services, products, and corporate. Its corporate segment held various rights in intellectual property and passive drug royalties. The latter included a cathepsin K inhibitor, odanacatib, a promising osteoporosis drug in its third phase of FDA testing. Defendants Richard H. Ayers, Jean–Luc Belingard, William G. Green, Peter Barton Hutt, Gail M. Naughton, Kathy Ordoñez, Wayne I. Roe, and Bennett M. Shapiro comprised Celera's Board of Directors ("the Board") at the time of the merger. Ordoñez also served as Celera's CEO. In the months before the merger, Celera had over 82 million outstanding shares and several thousand stockholders of record. BVF was then one of Celera's largest stockholders, owning more than five percent of Celera's outstanding shares.

Celera began investigating the possibility of a corporate sale in 2009, when it experienced an economic downturn. The Board hired a financial advisor, Credit Suisse Securities (USA) LLC ("Credit Suisse") to identify potential acquirers of Celera.[2] Credit Suisse ultimately identified five potential bidders, including Quest, a Delaware corporation with its principal place of business in Madison, New Jersey. Quest formed Spark, a wholly owned subsidiary, for the purpose of facilitating an acquisition of Celera. Quest and four other bidders, signed confidentiality agreements that forbade the bidders from making offers for Celera shares without an express invitation from the Board. The confidentiality agreements also contained broadly worded provisions preventing the bidders from asking the Board to waive this restriction (so-called "Don't Ask, Don't Waive" standstills).

Quest quickly emerged as a competitive bidder. After back-and-forth negotiations among Quest, a special committee of the Board, and a third bidder, Quest increased its offer to $10.25 per share in August, 2010. The Board found this offer acceptable, and authorized Ordofiez to begin discussing with Quest post-acquisition employment opportunities for Celera's senior management. Ordofiez and Quest disagreed over a one-time $3.4 million change-of-control payment. Quest also expressed concern over a negative yet-to-be published study of a gene variant called KIF6, a risk marker for heart disease that could be used to identify patients with that gene. The negative study created a substantial risk of adversely affecting the profitability in the future of one of Celera's products.

These concerns led Quest to back away from its negotiations with Celera. After negotiations failed, the negative study was published, and Celera's stock price declined. The stock price dropped to $5.77 per share by the fall of 2010. Quest then

---

2. The Board offered Credit Suisse a contingent compensation structure in exchange for the financial advisor's services, which would ultimately entitle Credit Suisse to an 8.8 million dollar fee upon successful closing of the merger.

delivered a non-binding offer letter to Celera proposing an acquisition at $7.00 per share, but these negotiations also fell through.

Celera attempted to locate other potential bidders for a strategic transaction, but found no serious suitors. Celera's difficulties continued into early 2011, by which time other members of the Board and several of Celera's stockholders began expressing dissatisfaction with Ordoñez's performance as CEO. Compounding Celera's woes, irregularities in their previous financial statements were identified and Celera's public accountant advised Celera of the possible need for a financial restatement.[3] Notwithstanding these developments, Quest returned to the bidding process with an offer of $7.75 per share, and negotiations between Quest and the Board recommenced. Around the same time, another prior bidder returned and offered to acquire Celera's products segment for $125 to $145 million. The Board rejected this offer in February of 2011, choosing instead to pursue negotiations with Quest.

It was at this point that BVF first informed the Board that it would attempt to block any transaction unless Celera's drug assets—particularly the passive drug royalties that included the osteoporosis drug, odanacatib—were sold separately. In the alternative, BVF requested that the deal provide some way for shareholders to participate in any future value attributable to those assets, especially if and when odanacatib was released on the market. Celera relayed BVF's requests to Quest, but Quest refused to consider them. Instead of pressing harder for Quest to fulfill BVF's requests, the Board made a counter-proposal to Quest for a transaction at

$8.25 per share. Quest countered with its "best and final" offer of $8.00 per share, equal to over $680 million.

Shortly thereafter, the Board unanimously approved the $8.00 per share offer and authorized Celera's management and legal counsel to finalize transaction agreements with Quest. Quest conditioned its offer on reaching a satisfactory employment agreement with Ordoñez. Ordoñez and Quest agreed to a three-year employment contract, which included an annual base salary of $500,000, an annual bonus of 60 percent of her base salary, and a one-time cash payment of approximately $2.3 million.[4]

In March of 2011, the Board convened to consider final approval of Celera's acquisition by Quest. The Board also decided to restate Celera's financials. In analyzing the fairness of the deal, the Board relied on a financial analysis prepared by Credit Suisse, which opined that anything within the range of $6.78 to $8.55 per share would be a fair acquisition price. Credit Suisse concluded that Quest's offer of $8.00 per share was fair.

In determining the range of acceptable prices, Credit Suisse relied on a Tufts University study published in 2002 to probability-adjust the value of Celera's drug assets. The Tufts study discussed the probabilities of a drug reaching the market from various phases of development. But Credit Suisse incorrectly interpreted the study as reporting probabilities of a drug proceeding from one phase of development to the next phase. Thus, Credit Suisse used a much lower probability of success rate for a given drug in its valuations than it should have. This error

---

3. Both NOERS and BVF contend that these developments motivated Ordoñez to consummate a sale of the corporation. The defendants collectively deny this characterization.

4. BVF contends that this employment package was worth at least double the initial employment package Quest offered Ordoñez during its initial negotiations in 2010.

was not immediately discovered. Even so, Ordoñez wrote in a December 2010 e-mail, "I don't think [Credit Suisse] got the analysis right." BVF argues that the error in the interpretation of the Tufts study resulted in the under-valuing of Celera's assets, specifically odanacatib.

The Board approved Quest's offer of $8.00 per share and reduced the terms it had been negotiating with Quest to a Merger Agreement executed on March 17, 2011. Quest's offer reflected an approximately 28% premium over the $6.27 closing price of Celera's common stock that day. Celera and Quest jointly announced the merger the next day. Celera also announced to the market its intent to re-state its financials for 2008, 2009 and the first three quarters of 2010.

### The Merger Agreement

The final deal structure outlined in the Merger Agreement contemplated a reverse triangular merger as part of a two-step transaction involving Celera and Quest's acquisition subsidiary, Spark. First, Spark would commence a twenty-one-day tender offer for any and all shares of Celera's common stock at $8.00 per share. The Agreement required Spark to extend its tender offer as necessary until it acquired voting control of Celera. Once it achieved voting control, Spark could commence a subsequent offering, for no more than twenty days, to reach up to 90% of Celera's voting control.

Assuming satisfaction of the above conditions, Spark would then effect a back-end merger between itself and Celera, with Celera as the resulting corporation. The back-end merger would cash out any remaining Celera stockholders at $8.00 per share, and Celera would become a wholly-owned subsidiary of Quest.

The Merger Agreement included several devices meant to safeguard Quest's inter-ests. Celera was required to pay Quest a termination fee of $23.45 million if Celera terminated the Merger Agreement and ac-cepted a competing offer. Additionally, the Board was bound by a "No Solicitation Provision" to terminate any existing dis-cussions with other potential bidders, and not to solicit competing offers. Finally, under the Merger Agreement Spark re-ceived an irrevocable "top-up" option, ex-ercisable only if Spark acquired over 60% of Celera's voting power during the tender offer. Once that occurred, Spark could exercise the option to acquire as many of Celera's authorized, unissued shares nec-essary for Spark to reach the 90% voting power margin and effect a back-end "short forum" merger.

### Opposition and Litigation

BVF's objection to the announced merg-er was swift. BVF emphatically disagreed with the adequacy of the $8.00 per share merger price. When the merger was an-nounced, BVF owned 6.6% of Celeras's stock. By the close of business on the day the merger was announced, BVF had near-ly doubled its ownership interest to 12% of the company in the course of one day. BVF hoped to buy as much stock in Celera as possible to drive the price up and to obtain voting control in order to prevent the merger. BVF continued to voice its concerns that $8.00 per share was too low and that Celera's passive drug royalties were being undervalued. BVF sent an open letter to Quest's CEO, informing Quest that BVF would not tender its shares, would seek competitors' bids, and would exercise its appraisal rights unless the deal was restructured. Quest's CEO publicly replied that $8.00 per share re-mained Quest's "best and final offer."

Less than a week after the merger was announced, NOERS filed a class action complaint in the Court of Chancery alleg-

ing breach of fiduciary duty claims against the defendants. The complaint included allegations that Quest aided and abetted the breaches. NOERS moved for expedited proceedings and preliminary injunctive relief, and immediately engaged in discovery. At approximately the same time, Spark commenced its front-end tender offer.

Over the next two weeks, NOERS' counsel received documentary discovery, deposed eight fact witnesses, and filed an opening brief in support of its motion for a preliminary injunction. On April 17, 2011, the day after the defendants filed their answering brief, NOERS and the defendants entered into a non-binding Memorandum of Understanding ("MOU") that contemplated a negotiated settlement to be presented to the Court of Chancery.

### The MOU and Subsequent Merger

The terms of the MOU neither increased the offer price nor otherwise addressed monetary components. Rather, the MOU provided for various "therapeutic" benefits. Specifically: (1) it reduced the $23.45 million termination fee to $15.6 million; (2) it modified the No Solicitation Provision to eliminate the Don't Ask, Don't Waive standstills agreements signed with four potential bidders; (3) it required the defendants to keep the tender offer open for seven additional days; and (4) it required Celera to provide supplemental disclosures relating to its financial status. An additional condition of the MOU was NOERS' agreement to a general release of any and all claims relating to the merger, including any potential claims for monetary damages by any member of the class.

Following the parties' adoption of the MOU, Credit Suisse's erroneous interpretation of the Tufts study was discovered. BVF filed a notice of its intent to object to the settlement in early May—before the

merger had closed and before the final settlement agreement had been submitted to the Court of Chancery. BVF asserted that the MOU's therapeutic benefits were of no value to it. BVF wanted monetary damages that reflected what (BVF claimed) was the real value of its stock and Celera's passive drug royalties.

None of the potential bidders affected by the MOU's waiver of the Don't Ask, Don't Waive standstills submitted competing offers. But, one day after the parties entered into the MOU, Black Horse Capital Management LLC ("Black Horse") contacted Celera, offering to partner with Quest in the acquisition. Black Horse was specifically interested in providing an additional $2.50 per share, in cash, for Celera's rights in odanacatib and other passive drug royalties it owned. This equated to more than $200 million. Quest was not interested in partnering with Black Horse and declined the offer.

By early May, Spark proved unable to satisfy the minimum conditions of the Merger Agreement, having received only 49.22% of Celera's common stock. After an additional day's extension, this percentage rose to 52.38% of Celera's common stock. After a subsequent offering period, Spark exceeded the necessary 60% threshold required to exercise its top-up option. On May 11, Quest announced its intent to exercise the top-up option and effect a short-form merger.

The merger officially closed on May 17, 2011. By the time the merger closed, BVF—which had continued buying as much Celera stock as it could—was Celera's largest shareholder. BVF owned 24.5% of Celera's then-outstanding shares. By May 17, the remaining shareholders of Celera stock, including BVF, were cashed out at $8.00 per share.

NOERS was not one of the shareholders cashed out on May 17, because it sold its

shares on May 13. Before the merger closed, the market price of Celera stock stayed above $8.00 per share, even after Quest announced its exercise of its top-up option on May 11. NOERS took advantage of this and sold its approximately 13,000 Celera shares for $8.0457 per share. NOERS' sale of its stock occurred after the Board approved of the merger, after the adoption of the MOU, and after some of the therapeutic benefits under the MOU had been realized. NOERS' sale of its stock preceded the closing of the merger by four days and it preceded the settlement of the class action by approximately 10 months.

### The Settlement

Approximately four months after the merger, NOERS and the defendants entered into a proposed final Stipulation and Agreement of Compromise and Settlement (the "Settlement Agreement"). The Settlement Agreement named NOERS as the class representative, and broadly defined the class as "[a]ny and all record holders and beneficial owners of share(s) of Celera common stock who held any such share(s) at any time [between February 3, 2010 and May 17, 2011, inclusive], but excluding the Defendants." The Settlement Agreement was expressly conditioned on the class being certified with no opt-out rights, so that members of the class could not independently pursue any other legal claim against the defendants.

█ BVF objected to the proposed settlement. BVF claimed breaches of fiduciary duties by the Board and Ordoñez, and aiding and abetting and securities fraud by Credit Suisse. BVF asserted that Celera's passive drug royalties, particularly those in odanacatib, were grossly undervalued in the merger—the same position which BVF took throughout the proposed merger.[5]

On March 23, 2012, over BVF's objection, the Court of Chancery certified the class as a non-opt out class under Court of Chancery Rule 23(b)(1) and (b)(2). The court chastised NOERS for its "substandard behavior" in selling its shares before the merger was consummated, noting that, "NOERS's careless and cavalier sale of all of its stock in Celera a few days before the short-form merger was effected definitely calls into question its suitability to serve as a class representative."[6] The court concluded that "notwithstanding its questionable conduct, NOERS still satisfies, if only barely, the requirement for an appropriate class representative."[7] The Court of Chancery explained:

> Technically permissible or not, that choice [by NOERS to sell its shares] failed to reflect an appropriate level of regard and respect for NOERS's position as a fiduciary for the class. As this case demonstrates, Delaware courts have good reason to expect more from those who would serve as lead plaintiffs in representative litigation. According-

---

5. We do not decide the merits of BVF's claims in this opinion. We note that in its reply brief, BVF cites a report from the Wall Street Journal which states that Quest added $386 million—150% of the value Quest paid for Celera's non-cash assets—in a single day as a result of the release of a clinical study on odanacatib. The Wall Street Journal reported that "[Goldman Sachs] believes investors have forgotten these and other royalties [Quest] has held since last year's acquisition of Celera." Wall Street Journal, *Quest Diagnostics Shares Up on Merck News*, July 12, 2012. Because this article was not part of the record before the Vice Chancellor, we decline to consider it in this appeal.

6. *In re Celera Corp. S'holder Litigation*, 2012 WL 1020471, at *1 (Del.Ch. Mar. 23, 2012).

7. *Id.* at *16.

ly, I may well employ a more bright line test in the future.[8]

Nevertheless, the court certified NOERS as the class representative, did not allow BVF to opt out of the class, and approved the Settlement Agreement as fair and reasonable. The court found that "Plaintiffs released claims for money damages against the Board, Ordoñez, and Credit Suisse are either weak, difficult to prove, or both."[9] Finally, the court awarded $1.35 million in attorneys' fees to NOERS. This appeal followed.

## ANALYSIS

BVF raises three arguments on appeal. First, BVF claims that NOERS was an inappropriate class representative because NOERS lacked standing to represent the class once it sold its shares in Celera. BVF argues various other grounds for why NOERS was an inappropriate class representative, including: NOERS was uniquely subject to potential equitable defenses, among them, acquiescence; NOERS is a "frequent-filer" plaintiff; NOERS lacked the support of the largest class member; and NOERS abdicated control of the litigation to its counsel.

Second, BVF claims that the Court of Chancery erred in not certifying the class as an opt-out class under Rule 23(b)(3). In the alternative, BVF argues that as a matter of due process and fundamental fairness, the Court of Chancery should have exercised its discretionary powers to allow BVF to opt out of the class certified under

Rule 23(b)(1) and (b)(2) in order to pursue its claims for monetary damages.

BVF's third and final argument on appeal is that the Court of Chancery erred in approving the settlement, because the settlement unfairly forced BVF to forego a valuable claim for scant consideration. We do not reach this argument, because of our holding that in this particular case BVF should have been permitted to opt out of the class.

### Standard of Review

■■■ We review the Court of Chancery's determinations on Rule 23 class certification for abuse of discretion.[10] To the extent that objectors to the class contend that the Court of Chancery formulated "incorrect legal precepts or applied those precepts incorrectly," we review those claims de novo.[11] To the extent that the certification of the class implicates due process claims, we review those claims de novo.[12] To the extent that the Court of Chancery's decision rests on a finding of fact, we will not set aside its factual findings "unless they are clearly wrong and the doing of justice requires their overturn."[13]

### NOERS had standing to represent the class

At oral argument, BVF argued that nine points in this case "coalesce" to support a finding that NOERS was an inadequate class representative: (1) the action is proposed to be conditionally certified for the purposes of proposing a settlement; (2)

---

**8.** *Id.*

**9.** *Id.* at *29.

**10.** *Prezant v. De Angelis,* 636 A.2d 915, 925 (Del.1994).

**11.** *In re Philadelphia Stock Exchange, Inc.,* 945 A.2d 1123, 1139 (Del.2008).

**12.** *Hercules Inc. v. Leu Trust and Banking (Bahamas) Ltd.,* 611 A.2d 476, 481 (Del.1992).

**13.** *Montgomery Cellular Holding Co. v. Dobler,* 880 A.2d 206, 219 (Del.2005) (citing *Levitt v. Bouvier,* 287 A.2d 671, 673 (Del.1972)).

the class lacks an opt-out right; (3) the settlement is exclusively for non-monetary consideration; (4) NOERS is a "frequent-filer" plaintiff who sold its shares prior to the approval of the merger; (5) the settlement agreement was not entered until months after NOERS sold its shares; (6) the merger was opposed by Celera's largest stockholder, BVF; (7) even before selling its shares, NOERS's ownership interest was nominal compared to BVF's; (8) the Board's financial advisors committed a material valuation error that was not disclosed before the merger; and (9) the MOU expressly authorized NOERS, as the class representative, not to enter into the settlement agreement if it would not be in the best interests of the class.

■ BVF makes compelling arguments for why NOERS was not an adequate class representative, and the Court of Chancery recognized them. The court found NOERS to be adequate, but only barely.[14] For the reasons set forth fully below, we conclude it was not an abuse of discretion for the Court of Chancery to certify NOERS as the class representative.

Class actions in the Court of Chancery are governed by Chancery Court Rule 23. Rule 23 requires that "[a]s soon as practicable after the commencement of an action brought as a class action, the Court shall determine by order whether it is to be so maintained."[15] Rule 23(a) provides the analytical framework for certifying a class representative:

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.[16]

■ The requirements for standing to sue in Delaware courts are:

(1) the plaintiff must have suffered an injury in fact-an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the conduct complained of-the injury has to be fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.[17]

This Court has approved broad definitions of a proposed class before.[18] We have observed that it is "commonplace" for the definition to include members who held shares as of a given date.[19] This is consistent with a number of decisions of the Court of Chancery as well.[20]

---

14. *In re Celera Corp. S'holder Litigation,* 2012 WL 1020471 at *16.

15. Del. Ch. Ct. R. 23(c)(1).

16. Del. Ch. Ct. R. 23(a).

17. *Dover Historical Soc'y v. City of Dover Planning Com'n,* 838 A.2d 1103, 1110 (Del. 2003).

18. *See In re Philadelphia Stock Exchange, Inc.,* 945 A.2d at 1139–43 (Del.2008).

19. *Id.* at 1139 (citing *In re Prodigy Communs. Corp. S'holders Litig.,* 2002 WL 1767543 at *4 (Del.Ch. July 26, 2002)).

20. *See In re Prodigy Communs. Corp. S'holders Litig.,* 2002 WL 1767543 at *4 ("the class will ordinarily consist of those persons who held shares as of the date the transaction was announced"); *In re Triarc Cos., Inc. Class and Deriv. Litig.,* 791 A.2d 872, 878–79 (Del.Ch. 2001) ("it is commonplace for class certification orders … to define the relevant class as

In *In re Beatrice Cos., Inc. Litig.*, we held "the plaintiff must have been a stockholder at the time the terms of the merger were agreed upon." [21] In denying standing to an objector who did not own stock when the proposed merger was approved, we reasoned "it is the terms of the merger, rather than the technicality of its consummation, which are challenged." [22] Similarly, in *Schultz v. Ginsburg*, we affirmed the Court of Chancery's holding that shareholders who divested their shares prior to the close of a transaction, but held their interest when the transaction was approved, could share in the monetary proceeds of the settlement. [23]

Here, the parties' Settlement Agreement broadly defined the proposed class as "[a]ny and all record holders and beneficial owners of share(s) of Celera common stock who held any such share(s) at any time [between February 3, 2010 and May 17, 2011, inclusive], but excluding the Defendants." [24] This definition is in accord with the "commonplace" definitions in similar class action cases.

NOERS did sell its shares in Celera four days before the merger was consummated, and approximately ten months before the settlement was approved. But NOERS still owned its stock at the time the Board approved the merger and when the MOU was executed, and it fits squarely within the broad definition of the class contained in the Settlement Agreement. Thus, NOERS satisfies the three-prong

test of standing: it had a cognizable injury in fact at the time the merger was approved; the alleged breach of fiduciary duties was traceable to the defendants, and the Court of Chancery could address that injury in the form of a preliminary injunction and the subsequent settlement.

Two cases BVF relies upon are readily distinguishable. BVF argues that *Gesoff v. IIC Indus., Inc.* supports post-merger damage actions and supports its arguments against NOERS. In *Gesoff*, the Court of Chancery granted relief only to those shareholders who owned stock on the effective date of the merger. However, the plaintiffs in that case brought suit only on behalf of such stockholders.

BVF also relies on then–Vice Chancellor Steele's opinion in *Dieter v. Prime Computer, Inc.* for the proposition that the 'mere spectre of lack of standing'—that is, a potential argument that a class representative lacks standing without reaching the merits of such an argument—renders that class representative unfit to represent the class. [25] BVF overlooks that *Dieter* involved class representatives who purchased their shares well after the proposed merger at issue had been announced. [26]

Our conclusion that NOERS has sufficient standing is consistent with our holdings in *In re Beatrice Cos.* and *Schultz*. Based on our precedent and the broad definition of the proposed class in the Set-

all persons (other than the defendants) who owned shares as of a given date").

**21.** *In re Beatrice Cos., Inc. Litig.*, 522 A.2d 865 (TABLE), 1987 WL 36708 at \*3 (Del. Feb. 20, 1987).

**22.** *Id.* (citing *Newkirk v. W.J. Rainey, Inc.*, 76 A.2d 121, 123 (Del.Ch.1950); *see also Dieter v. Prime Computer, Inc.*, 681 A.2d 1068, 1072 (Del.Ch.1996))(stating "[i]t is not the Merger that constitutes the wrongful act of which

Plaintiffs complain; it is the 'fixing of the terms of the transaction' ").

**23.** *Schultz v. Ginsburg*, 965 A.2d 661, 667 (Del.2009).

**24.** *In re Celera Corp. S'holder Litig.*, 2012 WL 1020471, at \*9.

**25.** *Dieter*, 681 A.2d at 1072–73.

**26.** *Id.* at 1072.

tlement Agreement, we conclude that NOERS has legal standing to represent the class because it held Celera stock at the time the merger was approved. The adequacy of such a class representative is a separate issue that remains within the discretion of the Court of Chancery.

### NOERS did not acquiesce in the merger

BVF alternatively argues that NOERS was unfit to represent the class because it was potentially subject to unique equitable defenses, thereby failing the "typicality" requirement. Specifically, BVF contends that NOERS was subject to an acquiescence defense.

In *Bershad v. Curtiss–Wright Corp.*, we held that a shareholder acquiesces in a merger—and thus cannot subsequently challenge the fairness of the transaction—where the shareholder makes a fully informed vote in favor of the merger, or accepts the benefits of the transaction.[27] The Court of Chancery has held that where minority shareholders are faced with a choice between accepting an inadequate merger buy-out or pursuing inadequate appraisal, the shareholders did not acquiesce in the merger by accepting the buy-out.[28]

■ NOERS did not acquiesce in the merger. NOERS neither voted in favor of the merger nor accepted the benefits of the transaction. It filed a suit seeking a preliminary injunction to stop the merger. NOERS did avail itself of the opportunity to sell its shares above the buy-out price, but that does not rise to the level of acquiescence required by *Bershad.* As to the other defenses referred to in its brief—

such as waiver—BVF merely identifies the defenses without providing sufficient evidence to support them. The spectre of these defenses is insufficient to render NOERS an atypical or inadequate class representative. BVF's argument regarding NOERS' susceptibility to equitable defenses therefore fails.

### BVF's other arguments against NOERS' certification as class representative also fail

BVF raises three additional arguments challenging NOERS' fitness to represent the class. The first is that NOERS is a so-called "frequent-filer plaintiff." The second is that NOERS lacked the support of Celera's largest stockholder. The third is that NOERS was an inadequate representative because it abdicated control of the class to its lawyers.

■ Turning to BVF's first argument, BVF claims NOERS is a "frequent-filer plaintiff" with an incentive to allow settlements less favorable to the class and which maximize the fees of its lawyers. NOERS responds that BVF has engaged in "childish name calling" and that its prior service as a class representative actually weighs in favor of its adequacy as a class representative.[29] The Court of Chancery carefully considered the challenges BVF made to NOERS motives and qualifications and found no merit to them. We decline BVF's invitation to bar a repeat litigant from serving as a class representative. Even if we were to recognize the "frequent-filer" term, BVF has not shown that the Court of Chancery abused its discretion under Rule 23(a).

---

27. *Bershad v. Curtiss–Wright Corp.*, 535 A.2d 840, 848 (Del.1987) (citations omitted).

28. *In re Best Lock Corp. S'holder Litig.*, 845 A.2d 1057, 1075, 1082 (Del.Ch.2001).

29. *See e.g. Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 954 (7th Cir.2006); *Wells v. HBO & Co.*, 1991 WL 131177 at *6 (N.D.Ga. Apr. 24, 1991).

■ As to BVF's next argument, it is true that NOERS lacked the support of BVF, Celera's largest shareholder. BVF has failed to cite any case law *requiring* a class representative to have such support. While the lack of support of large shareholders is a factor the Court of Chancery may consider in deciding who will represent a class, we decline to hold that factor, without more, would transform NOERS into an inadequate representative.

As to BVF's third argument, that NOERS abdicated control of the litigation to its counsel, that merely restates BVF's "frequent-filer" argument. BVF has offered no evidence in the record to indicate that NOERS, at any time during the proceedings below, abdicated control of the litigation to its lawyers. Accordingly, we find this argument also lacks merit.

### The Court of Chancery did not err in certifying the class under Rule 23(b)(1) and 23(b)(2)

BVF's next argument is two-fold: (1) the Court of Chancery abused its discretion in certifying the class under Court of Chancery Rule 23(b)(1) and 23(b)(2); and (2) in any event, the Court of Chancery abused its discretion in not allowing BVF to opt out based on due process and fundamental fairness.

In *Nottingham Partners v. Dana* we described the three different categories of classes certifiable under Rule 23(b):

Chancery Court Rule 23(b) divides class actions into three categories. Subdivision (b)(1) "applies to class actions that are necessary to protect the party opposing the class or members of the class from inconsistent adjudications in separate actions." Subdivision (b)(2) "applies to class actions for class-wide injunctive or declaratory relief." Subdivision (b)(3) "applies when common questions of law or fact predominate and a class action would be superior to other means of adjudication." [30]

■ "Class suits are not necessarily mutually exclusive; an action may be certified under more than one subdivision of Rule 23(b) in appropriate circumstances." [31] If a class is certified under Rule 23(b)(3), class members have an unqualified right to opt out of the class. [32] There is no corresponding mandatory opt-out right for classes certified under Rule 23(b)(1) or (b)(2). [33] In analyzing Rule 23's counterpart under the Federal Rules of Civil Procedure, the United States Supreme Court has stated that a federal court must engage in a "rigorous analysis" in certifying a class. [34] A rigorous analysis is similarly required under the Delaware counterpart, as we have held, "the Court of Chancery is required to make an explicit determination on the record of the propriety of the class action according to the requisites of Rule 23(a) and (b)." [35]

■ Delaware courts "repeatedly have held that actions challenging the propriety of director conduct in carrying out corporate transactions are properly certifiable under both subdivisions (b)(1) and

**30.** *Nottingham Partners v. Dana*, 564 A.2d 1089, 1095 (Del.1989) (internal citations omitted).

**31.** *Leon N. Weiner Assocs., Inc. v. Krapf*, 584 A.2d 1220, 1226 (Del.1991).

**32.** Del. Ch. Ct. R. 23(c)(2).

**33.** *Nottingham Partners*, 564 A.2d at 1097–98.

**34.** *Wal–Mart Stores, Inc. v. Dukes*, — U.S. —, —, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374 (2011).

**35.** *Prezant v. De Angelis*, 636 A.2d 915, 925 (Del.1994).

(b)(2)."[36] The availability of potential damages alone does not automatically require certification under Rule 23(b)(3).[37] Nor as we noted, in *Nottingham Partners*, does certification under Rule 23(b)(2) require that a class action seek injunctive or declaratory relief as an exclusive remedy.[38] Rather, certification under Rule 23(b)(2) is appropriate when the rights and interests of the class members are homogeneous.[39] A Rule 23(b)(2) class may seek monetary damages in addition to declaratory or injunctive relief, so long as the claim for equitable relief predominants.[40]

 In its order certifying the class under Rules 23(b)(1) and (b)(2), the Court of Chancery relied on "well-settled Delaware precedent," including our opinion in *Nottingham Partners*,[41] which we here reaffirm. We hold that the Court of Chancery did not abuse its discretion in certifying the class under Rule 23(b)(1) and (b)(2).

### The Court of Chancery abused its discretion in not allowing BVF to opt out of the class

Our conclusion upholding the class certification does not end the analysis, however. A separate, rigorous analysis is required to determine whether the Court of Chancery abused its discretion in not allowing BVF to opt out of the Rule 23(b)(2) class. BVF requested that the Court of Chancery exercise its equitable discretion and allow BVF to opt out of the class on grounds of fundamental fairness and due process. The Court of Chancery declined to allow BVF a discretionary opt out right because "providing opt out rights effectually would amount to disapproving the settlement altogether." The court instead preferred to "consider whether such a result is appropriate based on the merits of the settlement, and not Rule 23."[42] Having carefully reviewed the record, we conclude the Court of Chancery erred in denying BVF a discretionary opt-out right.

 "[Delaware] law favors the voluntary settlement of contested issues."[43] Settlement agreements "almost invariably" include general release provisions that bind the class and release all liability claims associated with the challenged transaction "to the broadest extent allowable under law."[44] Such broad release provisions are intended to accord the defendants "global peace."[45] Given the breadth of these provisions, "unless care is taken" in approving the settlement of a class action, particularly one involving a publicly traded corporation, there is a risk that "absent class members and others

**36.** *In re Cox Radio, Inc. S'holders Litig.*, 2010 WL 1806616, at *8 (citations omitted) (Del. Ch. May 6, 2010).

**37.** *Joseph v. Shell Oil Co.*, 1985 WL 21125 at *5 (Del.Ch. Feb. 8, 1985).

**38.** *Nottingham Partners*, 564 A.2d at 1096.

**39.** *Id.* at 1095 (internal citations omitted).

**40.** *Id.* at 1096. The Court of Chancery correctly holding that *Nottingham Partners* controlled and that *Wal–Mart Stores, Inc. v. Dukes* does not require otherwise. See *In re Celera Corp. S'holder Litigation*, 2012 WL 1020471, at *18.

**41.** *In re Celera Corp. S'holder Litigation*, 2012 WL 1020471, at *17.

**42.** *In re Celera Corp. S'holder Litigation*, 2012 WL 1020471, at *20.

**43.** *Rome v. Archer*, 197 A.2d 49, 53 (Del. 1964).

**44.** *In re Countrywide Corp. S'holders Litig.*, 2009 WL 846019, at *10 (Del.Ch. Mar. 31, 2009).

**45.** *Id.* (citations omitted).

with a stake in the litigation could have their claims released without an opportunity to be heard."[46] As the Court of Chancery recognized in *In re Countrywide Corp. S'holders Litig.*:

> The Court of Chancery must participate in the consummation of the settlement and ensure that the fiduciary nature of the class action is respected, and that its approval of any class-based settlement does not offend due process.[47]

■ Rule 23 (e)'s requirement that court approval be obtained before any settlement is consummated and the Court of Chancery's role in reviewing the settlement is required to safeguard due process rights,[48] to ensure that the settlement represents "a genuine bargained-for exchange between adversaries with a bona fide stake in the litigation," and also that the settlement agreement's terms "provide a benefit to the members of the class and not merely a promise to pay the fees of their counsel."[49]

■ The Court of Chancery's role in approving class action settlements under Rule 23 "is intended to balance policies favoring settlement with concerns for due process"[50]:

> Equitable notions of fairness and efficiency justify the use of the class action device. Yet its departure from the usual course requires ardent respect for the limits of due process, limits that dictate when a party may be constitutionally bound by litigation conducted by another. Court of Chancery Rule 23 is designed to protect the due process rights of absent class members. Only through strict compliance with Rule 23 may a court's judgment bind the absent members. Settlements reached in the absence of strict compliance will fail to deliver the 'global peace' defendants seek.[51]

With this balancing in mind we address whether the Court of Chancery properly exercised its discretion in denying a discretionary opt-out right to BVF under Rule 23(b)(2).

### The discretionary opt-out right

■ Like its federal counterpart, Chancery Court Rule 23 contains no provision that specifically authorizes the court to grant opt-out rights to class members of any class not certified under Rule 23(b)(3).[52] The Advisory Committee Notes to the Federal Rules are also silent on whether there can be opt-out rights in a 23(b)(1) or 23(b)(2) class. The source of the trial court's authority to grant opt-out rights in that context is Court of Chancery Rule 23(d)(2), which provides that "notice [shall] be given in such manner as the

**46.** Edward P. Welch et al., *Mergers & Acquisitions Deal Litigation Under Delaware Corporation Law* § 11.01 (2012).

**47.** *In re Countrywide Corp. S'holders Litig.*, 2009 WL 846019 at *10 (Del.Ch. Mar. 31, 2009).

**48.** *Prezant v. De Angelis*, 636 A.2d 915, 923 (Del.1994) (finding the adequacy of the class representative has a constitutional dimension under the Due Process Clause of the United States Constitution.)

**49.** *Id.*

**50.** *See Barkan v. Amsted Indus., Inc.*, 567 A.2d 1279, 1283 (Del.1989) (the Court of Chancery must balance "the policy preference for settlement against the need to insure that the interests of the class have been fairly represented"); Welch et al., *supra* note 46.

**51.** *In re Countrywide Corp. S'holders Litig.*, 2009 WL 846019 at *10 (internal citations omitted).

**52.** James W. Moore et. al, 5–23 *Moore's Federal Practice—Civil* § 23.42 (3d ed.2012).

Court directs."[53] That language has been interpreted as a "broad grant of authority" that authorizes courts, at their discretion, to require both notice and the right to opt out of classes certified under Rule 23(b)(2).[54] Whether to grant a discretionary opt-out requires balancing "whether the perceived need for these additional ... protections ... outweighs the costs and potential undermining of unitary adjudication or settlement."[55]

We have recognized that circumstances may arise where discretionary opt-out rights should be granted, such as where the class representative does not adequately represent the interests of particular class members, triggering due process concerns.[56] *Newberg on Class Actions* notes that in certifying a 23(b)(2) class, discretionary opt-out rights "may be permitted, and have been employed."[57] Occasions where courts have granted discretionary opt-out rights include: when the claims of an objector seeking to opt out are sufficiently distinct from the claims of the class as a whole and an opt out is appropriate to facilitate the fair and efficient conduct of the action.[58]

In *Nottingham* Partners, we examined the nature of discretionary opt-out rights in a 23(b)(2) class action. We noted the general rule that "when a portion of the relief which is sought is monetary, a member of a class certified under Rule 23(b)(2) has a constitutional due process right to notification but not a right to opt out."[59] We further explained:

[T]he Court of Chancery has discretionary power [to provide an opt out right] if it believes that an opt out right is necessary to protect the interest of absent class members ... In exercising its discretion ... the Court of Chancery must balance the equities of the defendants' desire to resolve all claims in a single proceeding against the individuals' interest in having their own day in Court.[60]

Necessarily, the Court of Chancery has the discretionary power to grant opt-out rights to members of a 23(b)(2) class when fairness and equity demand it.[61] Although it is discretionary, a decision to grant or deny opt-out rights to members of a 23(b) class is subject to reversal by this Court "if it constitutes an abuse of discretion under the facts and circumstances presented."[62]

BVF argued to the Court of Chancery that it would be "fundamentally unfair" to permit a holder of a small amount of stock (here, NOERS) to "drag" the significant stock holder with significant monetary claim (here, BVF) into a class action, settle that action for non-monetary consideration, and then seek millions of dollars in attorney's fees.[63] The Court of Chancery rejected this argument.[64] The court noted

53. Ch.Ct.R. 23(d)(2).

54. Joseph M. McLaughlin, 1 *McLaughlin on Class Actions* § 5:21 (8th ed.2011).

55. *Id.*

56. *Prezant*, 636 A.2d at 924.

57. William B. Rubenstein, 2 *Newberg on Class Actions* § 4:36 (5th ed.2012).

58. *Id.* n. 8 (internal citations omitted).

59. *Nottingham Partners*, 564 A.2d at 1101 (citations omitted).

60. *Id.* (citing *Penson v. Terminal Transp. Co.*, 634 F.2d 989, 993–94 (5th Cir.1981)).

61. *See* McLaughlin, *supra* note 54; Rubenstein, *supra* note 57.

62. *Id.* (citing *Penson,* 634 F.2d at 994).

63. *In re Celera Corp. S'holder Litig.*, 2012 WL 1020471, at *19.

64. *Id.*

that the Settlement Agreement was conditioned on the class being certified without opt out rights,[65] and explained that "Defendants seek complete peace in this settlement," and "permitting BVF to litigate the identical claims being settled ... would utterly defeat the purpose of the settlement."[66] That may be true, but in this case the objective of complete peace through a non opt-out settlement is outweighed by the due process concerns.

■ Class certification must be assessed based on the facts and circumstances at the time of the settlement/certification hearing.[67] As originally filed, this case presented claims that were primarily for equitable relief. Thereafter, in somewhat unique circumstances, the parties agreed to a *de facto* settlement of those equitable claims without formal court approval, leaving only monetary damage claims as the subject of a later formal, *de jure* application for a court-approved settlement. The hearing and the settlement and class certification occurred nearly one year after the merger. In approving such a settlement—and the nature of the class certification as part of that settlement—the Court of Chancery should not—and indeed cannot—blind itself to that reality and treat the settlement as one in which the equitable claims were still viable and predominant. The "posture of the case as it realistically exists" must be considered,[68] if only because due process concerns permeate any settlement of claims that by

that time were essentially for monetary damages.

■ We recognize, and have held, that the Court of Chancery was not required in this case to certify the class under (b)(3). The court could properly certify under (b)(2) because claims for equitable relief were originally predominant. But, having done that, the court could not deny a discretionary opt-out right where the policy favoring a global settlement was outweighed by due process concerns. Here, the class representative was "barely" adequate,[69] the objector was a significant shareholder prepared independently to prosecute a clearly identified and supportable claim for substantial money damages, and the only claims realistically being settled at the time of the certification hearing nearly a year after the merger were for money damages. Under these particular facts and circumstances, the Court of Chancery had to provide an opt-out right.

### CONCLUSION

The Court of Chancery did not abuse its discretion in certifying NOERS as the class representative. NOERS had standing to represent the class because it owned Celera stock when the Board approved the merger. NOERS did not divest itself of standing as a matter of law when it sold its shares prior to the consummation of the merger. Nor did the Court of Chancery abuse its discretion in certifying the class under Rule 23(b)(1) and 23(b)(2). But it

**65.** *Id.*

**66.** *Id.* at *20.

**67.** *See Parker v. Time Warner Entm't Co.,* 331 F.3d 13, 20–22 (2d Cir.2003) (holding class certification should be assessed at the time of a hearing conducted after a certification motion has been filed); *Robinson v. Metro–North,* 267 F.3d 147, 163 n. 8 (9th Cir.2001) (clarifying that class certification is assessed at time

of the present motion, and not at a future point in time when plaintiff may file another motion for class certification based on changed circumstances).

**68.** *Frazer v. Worldwide Energy Corp.,* 1990 WL 61192, 16 Del. J. Corp. L. 732, 738 (Del.Ch. May 3, 1990).

**69.** *In re Celera Corp. S'holder Litigation,* 2012 WL 1020471 at *16.

was an abuse of discretion to not provide an opt out right in this case. Accordingly, the judgment of the Court of Chancery is **AFFIRMED IN PART AND REVERSED IN PART.** This matter is remanded for further proceedings consistent with this Opinion.