# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BUCKLEY FAMILY TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2018-0903-AGB |
| | ) | |
| CHARLES PATRICK MCCLEARY, | ) | |
| JAMES MCCLEARY, JOHN | ) | |
| MCCLEARY, MARGARET | ) | |
| MCCLEARY STURGES, and SARAH | ) | |
| MCCLEARY STOVER, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MCCLEARY, INC., a Delaware | ) | |
| Corporation, | ) | |
| | ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: December 2, 2019
Date Decided: March 31, 2020

Peter J. Walsh, Jr. and Jacqueline A. Rogers, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; *Attorneys for Plaintiff Buckley Family Trust.*

Daniel A. Dreisbach, Richard P. Rollo, and Angela Lam, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; *Attorneys for Defendants Charles Patrick McCleary, James McCleary, John McCleary, Margaret McCleary Sturges, and Sarah McCleary Stover, and Nominal Defendant McCleary, Inc.*

**BOUCHARD, C.**

The Buckley Family Trust is one of seven stockholders of McCleary, Inc., a small privately held snack food company. Five of the other stockholders are descendants of the company's founder who comprise its board of directors. Frustrated with the lack of return it has received on its shares, the Trust sought books and records from the company and then filed this action against its board members.

The Trust's complaint contains two claims. The first claim seeks to compel the company to pay a dividend. The second claim asserts, in the main, that the directors breached their fiduciary duty of care concerning various decisions they made and various matters they allegedly failed to manage or address properly. Unlike in most cases this court sees, McCleary, Inc. does not have a provision in its certificate of incorporation exculpating its directors for monetary damages for breaches of the duty of care. Defendants have moved to dismiss both claims for failure to state a claim for relief. Defendants also have moved to dismiss the second claim, which the Trust brings derivatively on behalf of the company, for failure to make a demand on the company's board before filing suit.

For the reasons explained below, the court grants the motion to dismiss as to both claims. As to the first claim, the Trust has failed to allege facts that would warrant second-guessing the directors' business judgment in declining to declare more dividends than they have in the past. As to the second claim, the Trust has

1

failed to plead with particularity facts creating a reasonable doubt about the directors' ability to consider a demand impartially.

## I. BACKGROUND

The facts recited in this opinion come from the Verified Amended Complaint (the "Complaint") and documents incorporated therein, which include meeting minutes, financial statements, and other internal documents of McCleary, Inc. that were produced to plaintiff in response to a demand under 8 *Del. C.* § 220.[1] Plaintiff agrees that the court may consider these documents in its disposition of this motion.[2]

### A. The Players

In 1960, Eugene "Mac" McCleary founded the predecessor of McCleary, Inc. ("McCleary" or the "Company"), a Delaware corporation with its principal place of business in South Beloit, Illinois.[3] The Company manufactures and distributes snack food products through its wholly owned subsidiary, Axium Foods, Inc. ("Axium").[4] Jerry Stokely was President of Axium during the period relevant to the Complaint.[5] In 1986, the Company was reorganized as an "S" corporation.[6] At the time of the

---

[1] Verified Am. Compl. ("Compl.") (Dkt. 19).

[2] Tr. 80 (Dkt. 42).

[3] Compl. ¶¶ 5, 12, 17.

[4] *Id.* ¶ 5.

[5] *Id.* Ex. B at M1392.

[6] Compl. ¶ 17.

2

reorganization, Grace Knoll, who made a capital investment when the Company was founded, received non-voting common stock in the Company. [7]

Defendants Charles Patrick McCleary ("Pat McCleary"), James McCleary, John McCleary, Margaret McCleary Sturges, and Sarah McCleary Stover (collectively, "Defendants" or the "McCleary Family Defendants") are all descendants of Mac McCleary.[8] They each hold 12,829 shares of voting common stock of the Company and serve on the Company's board of directors (the "Board").[9] The McCleary Family Defendants hold all of the Company's outstanding voting common stock and approximately 83.6% of the Company's 76,534 shares of outstanding voting and non-voting common stock.[10] Pat McCleary is the Company's Chief Executive Officer.[11]

Plaintiff Buckley Family Trust ("Plaintiff" or the "Trust") has held 6,291 shares of non-voting common stock of the Company since 2006.[12] The Company has one other stockholder, the John S. Haine Trust, which holds a similar number of shares of non-voting common stock.[13] Knoll, who died in 2001, originally held the

---

[7] *Id.* ¶¶ 16-17.

[8] *Id.* ¶¶ 6-10.

[9] *Id.*

[10] *Id.* ¶ 60; *see also* Tr. 5, 44.

[11] Compl. ¶ 62.

[12] *Id.* ¶ 4.

[13] *Id.* ¶¶ 24-26; Tr. 5, 43-44.

3

shares now held by the Trust and the Haine Trust, which together hold approximately 16.4% of the Company's outstanding common stock.

**B.     The Common Stock Purchase and Restriction Agreement**

In 1993, Knoll and the other McCleary stockholders executed a Common Stock Purchase and Restriction Agreement (the "Purchase and Restriction Agreement"), a copy of which is attached to the Complaint.[14] The Purchase and Restriction Agreement recites that the Company "elected to be treated as an S Corporation and the Shareholders desire to continue the election and to impose certain restrictions to insure that neither the Corporation nor any Shareholder shall take any action to jeopardize the election."[15] More specifically, the Purchase and Restriction Agreement restricts stockholders of the Company from selling or transferring any of their shares "for any reason" without first offering to sell them to the Company and, if the Company does not elect to purchase the shares, to the other stockholders of the Company.[16]

---

[14] Compl. ¶ 18; *see also id.* Ex. A ("Purchase and Restriction Agreement") at 1 (reciting that the Restriction Agreement is "made and entered into . . . by and between all of the Shareholders of McCLEARY, Inc.").

[15] Purchase and Restriction Agreement at 1.

[16] Compl. ¶ 18; Purchase and Restriction Agreement §§ 1, 3.

Under the Purchase and Restriction Agreement, the purchase price for the non-voting shares is set at the greater of the book value of the shares or their appraised value, less a 30% discount for "lack of marketability and control":

> In the event any Shareholder desires to sell or transfer for any reason his or her shares of the Corporation, that person shall deliver written notice to the Corporation specifying that he or she desires to sell or transfer his or her shares, to whom the transfer will be made and all of the terms of the sale or transfer.

> On receipt of such notice, the Corporation shall have the exclusive option for a period of ninety (90) days after receipt of such notice in which to purchase the shares desired to be sold or transferred. The purchase price for said shares shall be the book value of the shares as computed by a certified public accountant designated by the Corporation using the most recent corporate year end income tax return or the most recent appraised value of the Corporation, divided by the number of shares outstanding (both voting and non-voting), whichever is greater, less the discount described hereafter. Any appraisal shall be an appraisal commissioned for examination by any Shareholder, less a discount of thirty (30%) percent applicable to all non-voting shares for lack of marketability and control.

> In the event the Corporation does not exercise its option to purchase, Shareholders shall have the exclusive option for a period of thirty (30) days next succeeding the expiration of the first option period, to purchase the shares so proposed to be sold or transferred at the price available to the Corporation.[17]

If the Company and the remaining stockholders do not elect to exercise their options under the provision quoted above, the selling stockholder may sell its shares to a third party subject to that person (i) "qualify[ing] as a Sub[chapter] S stockholder"

---

[17] Purchase and Restriction Agreement § 3.

and (ii) "execut[ing] . . . a stock restriction agreement approved by the Corporation."[18]

### C. Challenged Actions Approved by the Board

In December 2015, the Board authorized the Company to spend approximately $100,000 to improve its production facilities in order to do business with a competitor, Shearer's, for an expected "nine month commitment."[19] At the time, Shearer's was unable to meet its production needs.[20] Under the arrangement, the Company would use some of its production facility to package products for Shearer's.[21] Shearer's withdrew from the arrangement in early 2016, which was "sooner than the Board expected."[22]

In early 2016, the Company authorized the construction of a new warehouse in South Beloit, Illinois, where the Company is headquartered.[23] The purpose of the warehouse was to store Axium products and allow the Company to move away from relying on expensive offsite storage facilities.[24] In approving the project, the Board hoped to obtain local government assistance, and subsequently engaged in

---

[18] *Id.*

[19] Compl. ¶ 48; *id.* Ex. D at M1404, 1407.

[20] Compl. ¶ 48.

[21] *Id.*

[22] *Id.*

[23] *Id.* ¶ 49; *see id.* Ex. I at M0043.

[24] Compl. ¶ 49.

6

negotiations to receive a tax abatement.[25]  In May 2016, after the city council requested that the Company provide lifetime maintenance of the roads in the industrial park in which the warehouse would be located, the Board abandoned the project, at a loss of approximately $131,000.[26]

In April 2016, the Board decided to transition away from one of its customers, Aldi, which accounted for the largest component of the Company's sales, and to focus on a new customer, Truco.[27]  When the Board made this decision, Axium's President advised the Board that "the Company would be placed in a 'downward spiral' if it matched the lower prices of competitors as needed to retain Aldi."[28]

The relationship with Truco "quickly soured."[29]  The contract with Truco was "dropped" because Truco was "micro-managing" and "very painful and instructive to deal with."[30]  Less than one year after transitioning away from Aldi, the Company lowered its prices to reclaim Aldi as a customer.[31]  The decision to transition away

---

[25] *See id.* Ex. B at M1394; *id.* Ex. C at M1398.

[26] Compl. ¶ 49; *see id.* Ex. E at M1418.

[27] Compl. ¶ 46; *see id.* Ex. C at M1397.

[28] Compl. ¶ 46; *see id.* Ex. D at M1405.

[29] Compl. ¶ 47.

[30] *Id.*; *see id.* Ex. E at M1417-18.

[31] Compl. ¶ 47.

7

from, and eventually back to, Aldi resulted in approximately $10 million in lost sales as of January 2017.[32]

### D. Challenged Actions Not Approved by the Board

In addition to challenging the three actions discussed above that the Board approved, the Trust challenges three alleged failures of the Board concerning (i) needed improvements to the Company's production facilities, (ii) managing the Company's tax obligations, and (iii) observing corporate formalities. The facts relevant to these three subjects are discussed below in Part III.B.

## II. PROCEDURAL HISTORY

On March 22, 2019, the Trust filed its Complaint, which contains two claims. Count I asserts that Defendants committed an "oppressive abuse of discretion" by failing to declare a dividend.[33] Count II asserts, in the main, that Defendants "breached their fiduciary duties by failing to manage the Company's affairs with due care and in an informed manner" in various respects discussed below.[34]

On April 5, 2019, Defendants moved to dismiss both claims under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief, and to dismiss Count II under Rule 23.1 for failing to make a demand on the Board before initiating

---

[32] *Id.*; see *id.* Ex. E at M1419.

[33] Compl. at 26.

[34] *Id.* ¶ 75.

8

derivative litigation.[35] The matter was fully submitted on December 2, 2019, after oral argument and the receipt of supplemental submissions.

## III. ANALYSIS

The standards governing a motion to dismiss under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief are well settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and ([iv]) dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible to proof."[36]

Under Court of Chancery Rule 23.1, the court will grant a motion to dismiss if the putative derivative plaintiff has failed to make a pre-suit demand on a company's board or failed to plead facts showing that demand upon the board would have been futile.[37]

### A. Count I: Oppressive Abuse of Discretion

Count I of the Complaint is styled as a claim for "oppressive abuse of discretion."[38] It asserts that Defendants' "refusal to declare dividends for no legitimate business reason and despite substantial cash reserves constitutes

---

[35] Defs.' Opening Br. 15 (Dkt. 24); *see* Dkt. 21.

[36] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (internal citations omitted).

[37] *MCG Capital Corp. v. Maginn*, 2010 WL 1782271, at *4 (Del. Ch. May 5, 2010) (applying Ch. Ct. R. 23.1(a)).

[38] Compl. at 26.

oppressive misconduct and an abuse of discretion, designed to deny Plaintiff a return on its long-term investment in the Company and thereby coerce Plaintiff into selling its shares of stock to the McCleary Family Defendants for a substantial discount."[39]

With respect to the Company's finances, the Trust alleges that the Company had a surplus from which it could pay dividends of approximately $18.2 million as of October 2018,[40] and that the Company has retained unnecessarily high amounts of "surplus income" since the Trust became a stockholder in 2006.[41] The Complaint further alleges that the Board has not considered whether to declare a meaningful dividend since 2012 and has refused to do so "to coerce Plaintiff into selling its stock" to the McCleary Family Defendants "for a "substantial (30%) discount" under the terms of the Purchase and Restriction Agreement.[42]

Defendants counter that the decision whether or not to pay a dividend is subject to the business judgment rule and that the Complaint is devoid of facts establishing an oppressive or fraudulent abuse of discretion in failing to pay more dividends than it has in the past. Defendants further contend that Plaintiff's focus on the Company's "surplus" paints a misleading picture of its ability to issue

---

[39] *Id.* ¶ 70.

[40] *See* 8 *Del. C.* § 170(a)(1) ("every corporation, subject to any restrictions contained in its certificate of incorporation, may declare and pay dividends upon the shares of its capital stock . . . [o]ut of its surplus . . . .").

[41] Compl. ¶¶ 59-60.

[42] *Id.* ¶¶ 62-63.

dividends. Defendants point out, for example, that the Company's financial statements as of December 26, 2015 show that it had approximately $19.4 million in cumulative retained earnings but only approximately $7.3 million in liquid assets—consisting of approximately $2.3 million in cash and cash equivalents and approximately $5 million of investments in trading securities.[43] Put differently, according to Defendants, the Company's "surplus" on which the Trust focuses its attention "largely took the form of buildings, machinery, inventory, and equipment" that do not provide a liquid source of funds from which dividends could be paid.[44]

Section 170 of the Delaware General Corporation Law authorizes directors of a Delaware corporation to pay dividends, subject to certain limitations, out of the corporation's surplus or net profits:

> The directors of every corporation, subject to any restrictions contained in its certificate of incorporation, may declare and pay dividends upon the shares of its capital stock either:
>
> (1) Out of its surplus, as defined in and computed in accordance with §§ 154 and 244 of this title; or
>
> (2) In case there shall be no such surplus, out of its net profits for the fiscal year in which the dividend is declared and/or the preceding fiscal year.[45]

---

[43] *See id.* Ex. I at M0029-30. The Company's audited 2015 financial statements, which are attached to the Complaint, are the most recent ones in the record.

[44] Tr. 17.

[45] 8 *Del. C.* § 170(a).

11

In 1937, in a seminal decision, Chancellor Wolcott explained in *Eshleman v. Keenan* that although courts have the power to compel the declaration of a dividend, courts will do so only when the withholding of a dividend "is explicable *only* on theory of an oppressive or fraudulent abuse of discretion:"

> That courts have the power in proper cases to compel the directors to declare a dividend, is sustained by respectable authorities. But that they should do so on a mere showing that an asset exists from which a dividend may be declared, has never, I dare say, been asserted anywhere. In such a case the court acts only after a demonstration that the corporation's affairs are in a condition justifying the declaration of the dividend as a matter of prudent business management and *that the withholding of it is explicable only on the theory of an oppressive or fraudulent abuse of discretion.*[46]

Our Supreme Court has endorsed this statement of the law,[47] including in *Gabelli & Co., Inc. v. Liggett Group, Inc.,* where the high court summarized Delaware law concerning the payment of dividends as follows:

> It is settled law in this State that the declaration and payment of a dividend rests in the discretion of the corporation's board of directors in the exercise of its business judgment; that, before the courts will interfere with the judgment of the board of directors in such matter, fraud or gross abuse of discretion must be shown. *Moskowitz v. Bantrell*, Del. Supr., 190 A.2d 749 (1963). There, this Court quoted with approval the time-honored statement of Chancellor Wolcott . . . that courts act to compel the declaration of a dividend only upon a demonstration "that the withholding of it is explicable only on the theory of an oppressive or fraudulent abuse of discretion."[48]

---

[46] 194 A. 40, 43 (Del. Ch. 1937) (emphasis added), *aff'd*, 2 A.2d 904, (Del. 1938).

[47] *See Moskowitz v. Bantrell*, 190 A.2d 749, 750 (Del. 1963).

[48] 479 A.2d 276, 280 (Del. 1984) (quoting *Eshleman* 194 A. at 43); *see also Baron v. Allied Artists Pictures Corp.*, 337 A.2d 653, 659 (Del. Ch. 1975) ("Before a court will interfere

In support of its contention that the Company's refusal to issue additional dividends "is explained only by an oppressive abuse of discretion,"[49] the Trust relies on *Rubin v. Great Western United Corporation*[50] and *Litle v. Waters*,[51] where this court declined to dismiss claims challenging a board's failure to pay dividends. Both of these decisions, however, involved allegations of director self-interest that are readily distinguishable from the facts plead here.[52]

In *Rubin*, a holder of preferred stock alleged that the corporation's directors willfully refused "to make timely payment of dividends on such preferred stock" even though the corporation had "a surplus fund far in excess of the needs for this purpose, . . . by denominating the existing surplus and all future additions to it as a 'Special Purpose Reserve.'"[53] The Special Purpose Reserve allegedly was used to retain funds in the corporation in order "to improve the value and earnings of the

---

with the judgment of a board of directors in refusing to declare dividends, fraud or gross abuse of discretion must be shown.").

[49] Pl.'s Opp'n Br. 26 (Dkt. 27).

[50] 1975 WL 1261 (Del. Ch. Apr. 29, 1975).

[51] 1992 WL 25758 (Del. Ch. Feb. 11, 1992).

[52] In a footnote, the Trust also cites *Garza v. TV Answer, Inc.*, 1993 WL 77186 (Del. Ch. Mar. 15, 1993). That case did not concern the failure to pay dividends. The essence of the complaint in *Garza* was "that the individual defendants intentionally issued water-down stock to themselves for the purpose of enriching themselves at the expense of the corporation" and the plaintiffs. *Id.* at *5.

[53] 1975 WL 1261, at *1.

common stock of which the defendant-directors owned 32 per cent."[54]  In other words, the director defendants allegedly were motivated to divert value from the preferred stockholders to benefit themselves as common stockholders.  The court found that these allegations, "[w]hile perhaps weak," were sufficient to withstand a motion to dismiss.[55]

Unlike in *Rubin*, the Trust is not a preferred stockholder with a contractual entitlement to receive dividends.[56]  Rather, the Trust holds common stock and would share equally with the McCleary Family Defendants on a *pro rata* basis in any dividend that the Company issues since they each own only common stock of the Company.

In *Litle*, a holder of approximately 32% of the common stock of DMGT Corp. (Thomas Litle) asserted claims for breach of fiduciary and "gross and oppressive abuse of discretion" against the corporation's two directors, one of which (James Waters) held approximately 65% of DMGT's common stock.[57]  According to Litle,

---

[54] *Id.* (internal quotations omitted).

[55] *Id.* at *2.

[56] *See In re Trados Inc. S'holder Litig.*, 2009 WL 2225958, at *7 (Del. Ch. July 24, 2009) ("the rights and preferences of preferred stock are contractual in nature"); *see also Rothschild Int'l Corp. v. Liggett Gp., Inc.*, 474 A.2d 133, 136 (Del. 1984) ("[P]referential rights are contractual in nature and therefore are governed by the express provisions of a company's certificate of incorporation.").

[57] 1992 WL 25758 at *1, 6 (internal quotations omitted).

14

DMGT, an S corporation,[58] had achieved significant earnings for several years but the directors refused to issue any dividends in order to pressure Litle to sell "on the cheap" while using the corporation's profits to pay down debt it owed to Waters.[59]

In denying defendants' motion to dismiss, the *Litle* court explained that "Waters served his own personal financial interests in making his decision to have DMGT not declare dividends" in two ways, *i.e.*, (i) "to ensure that he would receive a greater share of the cash available for corporate distributions via loan repayments" and (ii) "to put pressure on Litle to sell his shares to him at a discount since the shares are and were only a liability on Litle."[60] As to the latter point, the court elaborated that Litle's allegations "set forth a classic squeeze out situation" where the "failure to pay dividends" was "especially devastating . . . since the corporation passes its income through to its shareholders," creating a tax liability for the plaintiff, "even though the corporation has not made any distributions to the shareholders."[61]

In contrast to *Litle*, the Complaint here acknowledges that, "in years when the Company was profitable, the Company issued a dividend equal to the amount

---

[58] Electing "to qualify as a Subchapter S corporation under the Internal Revenue Code . . . meant that the federal government would not tax the income of the entity on the entity level, rather, [the entity] would pass the income to its shareholders in a fashion similar to that of a partnership, notwithstanding whether or not the entity made cash distributions to its shareholders." *Id.* at *1.

[59] *Id.* at *1-2 (internal quotations omitted).

[60] *Id.* at *4.

[61] *Id.* at *8.

necessary for stockholders to pay their related tax obligations" and, beyond that, the Company declared a special dividend to all common stockholders totaling $3 million in 2012.[62] Thus, this case does not have the coercive dynamic of the "squeeze out situation" in *Litle*, where the plaintiff had to go out-of-pocket to pay taxes just to hold his shares.

Recognizing as much, the Trust argues that "the combined pressures of the lack of any meaningful dividends and no liquidity under the Purchase and Restriction Agreement" amounts to coercion, "forcing Plaintiff" to sell its shares at a "steep [30%] discount."[63] The problem with this argument is that contractually agreed upon restrictions on the sale or transfer of stock are permissible under Delaware law.[64] And in this case, the Trust obtained its McCleary shares subject to the terms and conditions of the Purchase and Restriction Agreement to which the donor of those shares (Grace Knoll) specifically agreed, including a "discount of thirty (30%) percent applicable to all non-voting shares for lack of marketability and control."[65] In my view, it is not coercion for the Trust—which has been under no compulsion

---

[62] Compl. ¶ 61.

[63] Pl.'s Opp'n Br. 30.

[64] 8 *Del. C.* § 202(b) ("A restriction on the transfer . . . of securities of a corporation, . . . may be imposed by . . . an agreement among any number of security holders or among such holders and the corporation.").

[65] Purchase and Restriction Agreement § 3.

16

to pay a tax liability in order to keep its shares—to honor this contractual obligation if it wishes to sell any of its shares of the Company.

Apart from the failure of the Complaint to state a cognizable theory of coercion, the Complaint fails—unlike in *Rubin* and *Litle*—to allege facts demonstrating that the McCleary Family Defendants' failure to authorize dividends was motivated by self-interest. The closest the Trust comes on this score is its assertion that the "McCleary Defendants presumably receive annual compensation from the Company for their roles as directors and/or officers while they hold off on declaring dividends."[66] The implication of this statement is that, instead of issuing dividends, the McCleary Family Defendants improperly diverted profits to themselves through excess compensation. But the Complaint does not provide *any* compensation figures or other facts to support this contention.

After this issue arose at oral argument, Defendants submitted compensation information to the court that had been produced to the Trust in response to its Section 220 demand before it filed suit but which was omitted from its Complaint. That information shows that (i) the Company's directors—which currently consist of five members—*collectively* received between $76,000 and $84,000 in fees annually from 2013 to 2017 and (ii) Pat McCleary received between $145,718 and $167,328 of

---

[66] Pl.'s Opp'n Br. 28.

17

compensation as CEO of the Company from 2013 to 2016.[67]  These figures hardly seem excessive for a Company with revenues ranging between $45 million and $50 million during this period.[68]  Indeed, in its response to Defendants' supplemental submission, the Trust did not take issue with the level of these payments or otherwise contend that Defendants received excessive compensation as directors and/or officers of the Company.[69]

As noted above, Count I of the Complaint is styled as a claim for "oppressive abuse of discretion."[70]  One decision of this court has remarked that such a claim is not an "independent cause of action . . . distinct from a cause of action based on a breach of fiduciary duty."[71]  This comment makes evident sense, although phrases like "fraud or gross abuse of discretion" and "oppressive or fraudulent abuse of discretion" persist in our case law governing the failure to declare a dividend.[72]  To my mind, these phrases describe in a situationally specific way the test to overcome business judgment review when a stockholder seeks to compel the declaration of a

---

[67] Dkt. 40 at 1-5.

[68] *See* Compl. Ex. H at M0009 (net sales figures for 2013-14); *id.* Ex. I at M0031 (net sales figures for 2014-15).

[69] *See* Dkt. 41.

[70] Compl. at 26.

[71] *Garza*, 1993 WL 77186, at *7.

[72] *See, e.g., Gabelli*, 479 A.2d at 280; *Moskowitz*, 190 A.2d at 750; *Eshleman*, 194 A. at 43.

dividend. Most famously, as discussed above, Chancellor Wolcott long ago articulated the key inquiry to determine when the court will compel the declaration of a dividend: when "the withholding of it is explicable *only* on the theory of an oppressive or fraudulent abuse of discretion."[73]

In my opinion, it is not reasonably conceivable that the Trust can demonstrate that the Board's failure to declare an additional dividend during the period in question is explicable only as an oppressive abuse of discretion given the Trust's failure to allege facts to support any cognizable theory of coercion or any disabling self-interest in making those decisions. What is left is a debate between the parties about whether the directors have allowed the Company to accumulate too large a surplus or excess cash reserves: the Trust asserts that the Company has ample resources to declare more dividends; the Defendants, who are charged with managing the Company's business and affairs, have a more conservative view. This is a quintessential matter of business judgment for which the Complaint offers no reasonably conceivable set of facts to warrant second-guessing the directors' decision-making under the operative legal standard. Accordingly, Count I fails to state a claim for relief.

---

[73] *Eshleman*, 194 A. at 43 (emphasis added).

## B. Count II: Breach of Fiduciary Duties

The gravamen of Count II of the Complaint is that the McCleary Family Defendants, "as directors and/or officers of the Company, . . . breached their fiduciary duties by failing to manage the Company's affairs with due care and in an informed manner."[74] The Trust challenges Defendants' due care concerning six subjects: (i) the decision to transition away from a key customer, Aldi; (ii) the failure to improve the Company's food production facilities; (iii) the decision to authorize building a new warehouse; (iv) the decision to improve the Company's packaging capabilities to accommodate another customer, Shearer's; (v) the failure to manage the Company's tax obligations; and (vi) the failure to observe corporate formalities.[75]

Count II also asserts a loyalty claim on the theory that the "McCleary Family Defendants refuse[d] to declare warranted dividends in order to coerce Plaintiff into selling it shares of stock to the McCleary Family Defendants for a substantial

---

[74] Compl. ¶¶ 74-75.

[75] Count II also questions Defendants' due care for allegedly failing "to even consider on an informed basis why the Company should maintain a large cash stockpile rather than declaring dividends." *Id.* ¶ 75. This issue is waived because the Trust did not challenge in its brief Defendants' failure to issue dividends as a breach of the duty of care. *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) (issues not briefed are deemed waived). Rather, as discussed above, the Trust's brief attacked Defendants' failure to declare additional dividends as an oppressive abuse of discretion and breach of the duty of loyalty.

20

discount."[76]  As the Trust acknowledges, this aspect of Count II is a reiteration of Count I,[77] which fails to state a claim for relief for the reasons explained in Part III.A.

The due care aspects of Count II are asserted derivatively on behalf of the Company but the Trust did not make a demand on the Board before filing this action. The court thus turns first to analyze whether it would have been futile for the Trust to make such a demand.

### 1. Demand Futility Standards

"A basic principle of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation."[78]  For this reason, the decision to bring or refrain from bringing a derivative claim on behalf of the corporation is the responsibility of the board of directors in the first instance.[79]  This approach "is designed to give a corporation, on whose behalf a derivative suit is brought, the opportunity to rectify the alleged wrong without suit or to control any litigation brought for its benefit."[80]

---

[76] Compl. ¶ 76.

[77] *See* Pl.'s Opp'n Br. 47 n.18 ("Plaintiff views claims related [to] the Board's failure to declare dividends out of the Company's ample surplus to be direct in nature, as pled in Count I, but pled a parallel derivative claim in Count II in the alternative.").

[78] *Spiegel v. Buntrock*, 571 A.2d 767, 772-73 (Del. 1990).

[79] *Id.*

[80] *Lewis v. Aronson*, 466 A.2d 375, 380 (Del. Ch. 1983), *rev'd on other grounds*, 473 A.2d 805 (Del. 1984).

Under Court of Chancery Rule 23.1, a stockholder who wishes to assert a derivative claim on behalf of a corporation must "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort."[81] Under the heightened pleading requirements of Rule 23.1, conclusory "allegations of fact or law not supported by the allegations of specific fact may not be taken as true."[82]

There are two tests under Delaware law for determining whether making a demand on the corporation's board of directors to pursue a claim may be excused as futile: the *Aronson* test and the *Rales* test. The court applies the first test, from *Aronson v. Lewis*, when "a *decision* of the board of directors is being challenged in the derivative suit."[83] The second test, from *Rales v. Blasband*, governs when "the board that would be considering the demand did not make a business decision which is being challenged in the derivative suit," such as "where directors are sued derivatively because they have failed to do something."[84]

---

[81] Ch. Ct. R. 23.1.

[82] *Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

[83] *Feuer ex rel. CBS Corp. v. Redstone*, 2018 WL 1870074, at *8 (Del. Ch. Apr. 19, 2018) (citations and internal quotations omitted).

[84] *Id.* (citations and internal quotations omitted).

Under *Aronson*, demand is futile if, "under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment."[85] Under *Rales*, demand is futile if the "factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to demand."[86]

Both Plaintiff and Defendants used the *Aronson* test to analyze each of the six issues listed above underlying the due care aspect of Count II. This is curious since three of these six issues involve alleged inactions of the Board (*i.e.*, alleged failures concerning food production facilities, managing tax obligations, and observing corporate formalities) to which the *Rales* test logically would apply.

This court has commented on many occasions that the *Aronson* and *Rales* tests look different but they essentially cover the same ground.[87] Their common ground

---

[85] *Aronson*, 473 A.2d at 814.

[86] *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993).

[87] *See, e.g.*, *Guttman v. Huang*, 823 A.2d 492, 501 (Del. Ch. 2003) (Strine, V.C.) ("At first blush, the *Rales* test looks somewhat different from *Aronson*, in that [it] involves a singular inquiry[.] . . . Upon closer examination, however, that singular inquiry makes germane all of the concerns relevant to both the first and second prongs of *Aronson*."); *David B. Shaev Profit Sharing Account v. Armstrong*, 2006 WL 391931, at *4 (Del. Ch. Feb. 13, 2006) (Lamb, V.C.) ("[T]he *Rales* test, in reality, folds the two-pronged *Aronson* test into one broader examination."), *aff'd*, 911 A.2d 802 (Del. 2006) (TABLE).

includes evaluating whether there is reason to doubt the impartiality of a majority of the directors to decide whether the corporation should pursue litigation because they (i) have a personal interest in the challenged transaction(s), (ii) lack independence from one who has such a personal interest, and/or (iii) are interested because they are exposed to a substantial likelihood of liability with respect to the underlying claim(s). Here, the Trust does not contend that any member of the Board has a personal financial interest in an underlying transaction, does not challenge the independence of any Board member, and focuses instead only on the third inquiry.[88] Thus, the sole inquiry relevant to this case is whether the Trust has pled with particularity that the McCleary Family Defendants face a substantial likelihood of liability with respect to any of the six issues identified above.[89] The court undertakes that inquiry next.

---

[88] Tr. 73; *see also* Pl.'s Opp'n Br. 35 ("Here, the Complaint alleges facts that all six directors . . . face substantial likelihood of personal liability in connection with the acts challenged in the Complaint.").

[89] Deciding whether Defendants face a substantial likelihood of liability resolves both prongs of the *Aronson* test in my view. Plaintiff acknowledges as much. With respect to the three issues involving Board decisions for which the *Aronson* test would apply (*i.e.*, the decisions to (i) transition away from Aldi, (ii) authorize building a new warehouse, and (iii) improve the Company's packaging capabilities), the Trust's discussion of the second prong of *Aronson* refers back to its analysis under the first prong concerning whether Defendants face a substantial likelihood of liability. *See* Pl.'s Opp'n Br. 49-50.

24

### 2. Do Defendants Face a Substantial Likelihood of Liability?

As noted above, the gravamen of Court II is that the McCleary Family Defendants should be held personally liable to the Company for various breaches of their duty of care. Insofar as Count II focuses on Defendants' actions as directors, this is the unusual case where such a theory is viable because the Company's certificate of incorporation does not include a provision under 8 *Del. C.* § 102(b)(7) exculpating its directors for monetary damages for breaches of the duty of care.[90]

Under Delaware law, the standard of care applicable to the fiduciary duty of care of a director or officer is gross negligence.[91] This court has defined gross negligence as "conduct that constitutes reckless indifference or actions that are without the bounds of reason."[92] "While the inquiry of whether the claims amount to gross negligence is necessarily fact-specific, the burden to plead gross negligence is a difficult one."[93] With these standards in mind, the court turns next to consider

---

[90] Compl. ¶ 39.

[91] *Aronson*, 473 A.2d at 812; *Smith v. Van Gorkom*, 488 A.2d 858, 873 (Del. 1985). The "fiduciary duties of officers are the same as those of directors." *Gantler v. Stephens*, 965 A.2d 695, 708-09 (Del. 2009).

[92] *McPadden v. Sidhu*, 964 A.2d 1262, 1274 (Del. Ch. 2008); *see also In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 750 (Del. Ch. 2005) ("In the duty of care context with respect to corporate fiduciaries, gross negligence has been defined as a 'reckless indifference to or a deliberate disregard of the whole body of stockholders' or actions which are 'without the bounds of reason.'"), *aff'd*, 906 A.2d 27 (Del. 2006); *In re TIBCO Software Inc. S'holders Litig.*, 2015 WL 6155894, at *23 (Del. Ch. Oct. 20, 2015).

[93] *Zucker v. Hassell*, 2016 WL 7011351, at *7 (Del. Ch. Nov. 30, 2016) (internal quotations and alterations omitted).

the Trust's six due care theories, beginning with the three that the Trust contends are its strongest.[94] The consistent theme of this analysis is that when the allegations of the Complaint and the documents incorporated therein are viewed in their totality,[95] the Trust has failed to demonstrate that the Board's actions or inactions were recklessly indifferent or without the bounds of reason such that the directors would face a substantial likelihood of liability.

### a. Aldi

In April 2016, the Company decided to transition away from its largest customer, Aldi, and to focus instead on a new customer, Truco.[96] The Trust contends that Defendants "decided to move away from . . . Aldi . . . without considering any analysis or information about the financial impact of the decision on the Company" and that the "Board instead relied only on the 'strong belief' of management that moving away from Aldi was the right move."[97]

Defendants counter that "the Board had been discussing and receiving reports from management regarding the Aldi relationship for at least [one] year."[98] The

---

[94] *See* Tr. 75-77.

[95] As noted at the outset of this decision, the Trust does not dispute that the court may consider on this motion the documents attached to the Complaint that the Trust received under 8 *Del. C.* § 220 and references throughout its pleading.

[96] Compl. ¶ 46.

[97] Pl.'s Opp'n Br. 37-38.

[98] Defs.' Reply Br. 25 (Dkt. 30).

Company's internal documents confirm this. The January 2015 Board minutes show that Stokely, Axium's then-President, expressed concern about "the percentage of company business with Aldi" and "needing to get other business" during a discussion about Axium having to reduce prices to keep Aldi's business.[99] Stokely also prepared an eleven page executive summary for the Board's 2015 year end meeting (the "2015 Year End Report").[100] In it, Stokely provided margin and sales data for Aldi and explained his reasoning for "remain[ing] firm on . . . pricing" and the implications if "Aldi moves the business to our competitors."[101] Stokely also expressed his opinion "that the company cannot continue to sell high volume – low margin private label business and remain viable in the long term" and that "[i]f the company were to acquiesce to Aldi's demands for lower price, it would place the company in a downward spiral."[102]

Insofar as the directors' reliance on Stokely is concerned, the amount and type of information a board considers is itself a matter of business judgment that is

---

[99] Compl. Ex. B. at M1394 ("Aldi had done a review of pricing available to them and the Axium pricing was higher than they could obtain. So Axium re-calculated and adjusted pricing. This allowed Axium to retain 9 distribution centers where they previously supplied 12.").

[100] *Id.* Ex. D.

[101] *Id*. at M1403-4.

[102] *Id*. at M1405; *see also id.* Ex. F at M1415 ("We do still make product for Aldi in lesser volume. But one positive from January 2016 was that we needed to eventually replace Aldi anyway due to the single customer liability issue.") (August 27, 2016 Board minutes).

generally left to the directors' discretion.[103]  Indeed, Delaware law protects directors who rely "in good faith . . . upon such information, opinions, reports or statements presented to the corporation by any of the corporation's officers or employees."[104]

In sum, the Trust has failed to allege facts suggesting that the directors relied on management's opinions or reports in bad faith and the internal documents attached to the Complaint, viewed in their totality, do not demonstrate that the directors failed to be informed about moving away from Aldi such that they could be said to have acted with reckless indifference or without the bounds of reason in making the decision.  Accordingly, Defendants do not face a substantial risk of personal liability with respect to this issue.

### b.    Food Production Facilities

The Trust asserts that Defendants "face a substantial likelihood of financial liability related to their failure to take sufficient steps to remedy known problems with the Company's food production facilities."[105]  For support, the Trust quotes, in part, from the following paragraph of the Board's minutes for its June 26, 2015 meeting:

---

[103] *See In re RJR Nabisco, Inc. S'holders Litig.*, 1989 WL 7036, at *19 (Del. Ch. Jan. 31, 1989) (Allen, C.) ("[T]he amount of information that it is prudent to have before a decision is made is itself a business judgment . . . .").

[104] 8 *Del. C.* § 141(e).

[105] Pl.'s Opp'n Br. 42.

Our building is outdated – everything. There are new rules and regulations for food plants since the building was originally built. Food buildings have to be "clean", and it takes a great deal of effort to keep our building certified for food production. We lose business because our plant is not up to date.[106]

Significantly, the same Board minutes quoted above also state that the Board agreed to move "forward with a list to renovate . . . [and] what needs to be done," and directed Stokely to "give us [budget] numbers by the end of August."[107] In his 2015 Year End Report, Stokely states, in a section covering "near term improvement plans," that the Company "needs to embark on a systematic face lift" that "needs to focus on reconditioning ceilings, walls, floors and lighting" at an estimated cost of $500,000, and opines that the initiative is not optional "[g]iven the current industry situation."[108] The Board's August 2016 minutes report that this expenditure was incurred.[109] These documents reflect that Defendants reacted in a meaningful way to a problem that management identified and plainly did not act with reckless

---

[106] Compl. Ex. G at M1396; *see* Compl. ¶ 52.

[107] Compl. Ex. G at M1396.

[108] *Id.* Ex. D at M1407. The Trust disparages the proposed initiative based on the use of term "face lift" in the 2015 Year End Report. What is more important than this label is the description of the work involved and the amount contemplated to pay for the improvements, which does not seem inconsequential for a company of this size.

[109] *Id.* Ex. F at M1415 ("It should be added that the Board had previously authorized a $500,000 plant improvement initiative and those funds were spent but it is not clear if they are fully reflected in the finances YTD.").

indifference or without the bounds of reason such that they would face a substantial risk of personal liability.

### c. New Warehouse

The Trust argues that the Board "acted without consideration of all material information in connection with its decision to develop a new warehouse to store product" in South Beloit, Illinois, the Company's principal place of business.[110] The Complaint asserts that the warehouse was "premised on the unfounded assumption that the local city council would support this initiative and provide favorable incentives."[111] The project was canceled, at a cost of approximately $131,000,[112] after the city council requested that the Company provide "lifetime maintenance of the roads" in the industrial park "where the warehouse would be located."[113]

Citing the Trust's own allegations, Defendants counter that the "Board determined to develop a new warehouse to store product because the Company incurred high costs to rent other offsite storage facilities"[114] and not based on a mistaken assumption about obtaining government assistance. Board minutes of a

---

[110] Pl.'s Opp'n Br. 40.

[111] Compl. ¶ 49.

[112] *Id.* Ex. E at M1418 (noting $161,000 of "development and engineering costs for the warehouse project . . . that was canceled," of which $30,000 "was for steel supports that can be re-used elsewhere") (January 21, 2017 Board minutes).

[113] *Id.* Ex. F at M1415.

[114] Compl. ¶ 49.

January 2015 meeting also reflect that the Board consulted with an outside advisor (Rockford Consulting), which had "done a detailed study of the Axium options" and "summarized all possible options that could be taken by the company."[115] The consultant specifically discussed "benefits coming from Government sources to keep the company where it is."[116] To that end, Board minutes of an April 2016 meeting reflect that "tax abatement" discussions were far along before discussions with the city council fell apart.[117]

In my view, the Trust has failed to plead with particularity that Defendants face a substantial likelihood of personal liability with respect to the aborted warehouse project. The Complaint itself recognizes that there was a compelling business reason to construct a new warehouse (to reduce the cost of renting offsite storage), the Board received outside advice before beginning the project, and it was hardly uninformed for the Board to believe it might receive government incentives from the community where it is headquartered—indeed the minutes reflect that significant tax abatement discussions occurred. Viewing these facts in their totality, the Board cannot be said to have acted with reckless indifference or without the bounds of reason in authorizing the development of a new warehouse.

---

[115] *Id.* Ex. B at M1394.

[116] *Id.*

[117] *Id.* Ex. C at M1398 ("A tax abatement is 2/3 of the way in process for the warehouse project.") (April 8, 2016 Board minutes).

31

### d. Shearer's

In 2015, the Board authorized the Company to renovate its production facilities to package products for Shearer's, an Axium competitor.[118] The 2015 Year End Report states that "[t]he company will need to invest approximately $100,000 to implement this process."[119]

The Trust contends that the Board's approval of this project was "uninformed and a breach of the McCleary Defendants' duty of care."[120] More specifically, the Trust alleges that "the Board's only discussion on the subject was speculation about what Shearer's inability to pack its own product meant about [Shearer's] business," citing to the 2015 Year End Report.[121] That report states that "[Shearer's] decision to outsource these products [indicates] that the Shearer's sales team sold products to customers that their production group is either unwilling or unable to make" and "signals that [Shearer's does] not have the productive capacity to manufacture the product."[122]

---

[118] Compl. ¶ 48.

[119] *Id.* Ex. D at M1407.

[120] Pl.'s Opp'n Br. 39.

[121] *Id.* (citing Compl. ¶ 48). The relevant part of paragraph 48 in turn cites to the 2015 Year End Report. *See* Compl. ¶ 48 (citing Compl. Ex. D at M1404).

[122] Compl. Ex. D at M1404.

Citing to the same report, Defendants respond that developing a relationship with Shearer's had the benefit "of being an audition for a potential sale partner."[123] To that end, the 2015 Year End Report states that Shearer's "is currently capacity constrained and has acquired several competitors in their quest to own the private label snack food manufacturing business," and that if "Axium Foods successfully meets Shearer's needs, then a logical conclusion would be to offer the company to Shearer's at a price that meets both party's needs."[124] The 2015 Year End Report further states that the short-term engagement with Shearer's had "strategic importance" for placing Axium into Shearer's supply chain.[125]

Having carefully reviewed the 2015 Year End Report on which both sides primarily rely, it is apparent that the Board was made aware of the estimated cost of renovating its production facilities to package products for Shearer's and that the Board authorized this proposal, at least in part, to develop a relationship with Shearer's to potentially sell Axium to it.[126] Given this, even though Shearer's ended the arrangement with Axium sooner than the Company had expected,[127] the Trust

---

[123] Defs.' Opening Br. 41.

[124] Compl. Ex. D at M1409.

[125] *Id.* at M1404.

[126] According to the minutes of the Board's January 2017 meeting, the door was "still open" with Shearer's at that time. *Id.* Ex. E at M1417.

[127] *Id.* Ex. F at M1414.

has failed to demonstrate that the Board acted with reckless indifference or without the bounds of reason in deciding to undertake the packaging venture with Shearer's. Accordingly, Defendants do not face a substantial risk of personal liability with respect to this issue.

### e. Tax Issues

The Trust argues that Defendants "have acted without the requisite level of care by consistently failing to appropriately manage the Company's tax obligations," citing two incidents.[128] First, the Trust alleges that, "[i]n 2016, the Company's certified public accountant advised management that the Company had been improperly calculating the distribution of profits to stockholders," which allegedly "threatened the Company's status as an S-corporation."[129] Second, the Trust alleges that "the Board failed to take adequate steps to address the impact of the 2017 Tax Cuts and Jobs Act on the Company's tax obligations."[130]

The cited paragraphs of the Complaint negate the notion that Defendants would face a substantial likelihood of personal liability with respect to either incident. As to the first incident, which concerned a technical issue about treating "Illinois residents and non-residents differently," the Complaint acknowledges that

---

[128] Pl.'s Opp'n Br. 43.

[129] *Id.* (citing Compl. ¶ 51).

[130] *Id.* (citing Compl. ¶ 50).

the Company's certified public accountant caught the error—demonstrating that systems were in place to oversee the Company's tax reporting functions—and it is not alleged that the Company suffered any harm as a result of the error.[131]  As to the second incident, the Complaint acknowledges that McCleary sought an extension to file its tax return to address the issue.[132]  As such, Defendants cannot be said to have acted with reckless indifference or without the bounds of reason.[133]

### f.    Corporate Formalities

The Trust argues that Defendants face a substantial likelihood of personal liability for breaching their duty of care on the theory that they "have consistently failed to manage the Company so as to observe certain corporate formalities."[134]  The Trust's brief focuses specifically on the Company's alleged "failure to properly notice stockholder meetings," which it contends "calls into question the validity of all actions taken at those meetings."[135]  Although the Trust sought documents under

---

[131] Compl. ¶ 51.

[132] *Id.* ¶ 50.

[133] Defendants argue that "the duty to manage the Company's tax obligations falls within the auspices of the Company's CFO and accounting department, not the Board." Defs.' Opening Br. 35 n.15.  This seems perfectly logical, but the court need not address the issue.

[134] Pl.'s Opp'n Br. 35.

[135] *Id.*  The Complaint challenges the Company's compliance with corporate formalities in three other respects, *i.e.*, (i) "lack of proper notice for Board meetings," (ii) that "Board and stockholder meetings are often held simultaneously and without any clear delineation between actions taken by the Board and actions taken by the stockholders," and (iii) that "the minutes for . . . Board and stockholder meetings are poorly drafted."  Compl. ¶¶ 41-44, 53, 55.  The Trust did not present any argument in its brief that Defendants faced a

8 *Del. C.* § 220, it does not challenge the validity of any specific action taken at a stockholder meeting where notice was not provided as required under Delaware law.[136]

Our Supreme Court has delineated the "requirements for standing to sue in Delaware courts," as follows:

> (1) the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.[137]

Given its failure to identify any specific action taken at a stockholder meeting of the Company where notice was not provided, any harm to the Company is purely

---

substantial likelihood of personal liability with respect to these alleged deficiencies and thus waived those issues. *See Emerald P'rs*, 726 A.2d at 1224 (issues not briefed are deemed waived). That said, although McCleary is a small company and may have limited resources, it would behoove the Company to prepare minutes that are clearer and more precise than the ones attached to the Complaint.

[136] The general notice requirement for stockholder meetings applies only to "each stockholder entitled to vote at such meeting." 8 *Del. C.* § 222(b). Other provisions of the Delaware General Corporation Law provide that notice must be provided to both "voting or nonvoting" stockholders in advance of stockholder meetings for certain specific purposes. *See* 8 *Del C.* §§ 204(d) (ratification of defective corporate acts), 251(c) (approval of merger or consolidation agreements). *See also* R. Franklin Balotti & Jesse A. Finkelstein, *Meeting of Stockholders* § 8.3 (3d ed. Supp. 2020) ("[O]nly those who have the right to vote at the meeting have an enforceable right to attend the meeting.").

[137] *In re Celera Corp. S'holders Litig.*, 59 A.3d 418, 423 (Del. 2012) (citing *Dover Historical Soc'y v. City of Dover Planning Comm'n*, 838 A.2d 1103, 1110 (Del. 2003)).

conjectural and speculative. The Trust thus lacks standing with respect to McCleary's alleged lack of compliance with corporate formalities and, even if it did not, the alleged harm is so conjectural and hypothetical that the Defendants would not face a substantial risk of liability with respect to this issue in any event.

\* \* \* \* \*

For the reasons explained above, the Trust has failed to demonstrate that making a demand on the Board before filing suit would have been futile. Accordingly, the court will dismiss Count II under Rule 23.1 and does not need to address Defendants' motion to dismiss Count II under Rule 12(b)(6).

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the Complaint in its entirety is GRANTED.

**IT IS SO ORDERED**.