IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JONATHAN URDAN, an individual and WILLIAM WOODWARD, an individual, | § § § | |
| | § | No. 423, 2019 |
| Plaintiffs Below, Appellants, | § § § | |
| | § | Court Below – Court of Chancery |
| v. | § § | of the State of Delaware |
| | § | |
| WR CAPITAL PARTNERS, LLC, a Delaware limited liability company, WR E3 HOLDINGS, LLC, a Delaware limited liability company, HENRI TALERMAN, an individual, and FRANK W. WALSH III, an individual, | § § § § § § § § | C.A. No. 2018-0343 |
| Defendants Below, Appellees, | § § § | |
| and | § § | |
| ENERGY EFFICIENT EQUITY, INC., a Delaware corporation, | § § § § | |
| Nominal Defendant Below. | § § | |

Submitted: September 30, 2020
Decided: December 8, 2020

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices, and **RENNIE**, Judge,[*] constituting the Court *en Banc*.

Upon appeal from the Court of Chancery. **AFFIRMED.**

---

[*] Sitting by designation under Del. Const. art. IV, § 12.

Elena C. Norman, Esquire, Benjamin M. Potts, Esquire, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Louis R. Miller, Esquire, Daniel S. Miller, Esquire, Jeffery B. White, Esquire (*argued*), MILLER BARONDESS, LLP, Los Angeles, California; *Attorneys for Appellants Jonathan Urdan and William Woodward*.

Kenneth J. Nachbar, Esquire (*argued*), Alexandra M. Cumings, Esquire, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; *Attorneys for Appellees WR Capital Partners, LLC, WR E3 Holdings, LLC, Henri Talerman, and Frank E. Walsh III*.

**SEITZ**, Chief Justice:

The plaintiffs now appellants were two of three founding owners, investors, and directors of Energy Efficient Equity, Inc. ("E3" or the "Corporation"), a Delaware corporation operating in the property-assessed, clean-energy financing industry. After a series of financing transactions with WR Capital Partners, LLC ("WR Capital"), the plaintiffs filed suit in the Court of Chancery against WR Capital and its representatives. Among other claims, the plaintiffs alleged that the defendants breached their fiduciary duties and were unjustly enriched when they negotiated and approved the financing transactions that allowed them to take control of E3 from the founders.

During the litigation, the plaintiffs entered into a settlement agreement and two stock repurchase agreements (the "Settlement Agreement" and the "Stock Repurchase Agreements"). The plaintiffs settled with some of the defendants in exchange for payments and the sale of the plaintiffs' stock to E3. The Settlement Agreement contained a release, but carved out claims that the plaintiffs wanted to continue to pursue against the non-settling WR Capital and its representatives. An inconsistency between the agreements arose, however, because the Stock Repurchase Agreements transferred "all of Seller's right, title, and interest" in E3 stock while only the Settlement Agreement contained a carve out for claims against the non-settling defendants (the "Release Carve Out").

3

After the partial settlement, the Court of Chancery granted the defendants' motion to dismiss. Relevant to this appeal, the Court of Chancery found that the plaintiffs could not import the Settlement Agreement's Release Carve Out into the Stock Repurchase Agreements; the plaintiffs lost standing to pursue their direct breach of fiduciary duty claims when they sold their E3 stock; and the plaintiffs' unjust enrichment claims were duplicative of their breach of fiduciary duty claims and traveled with the sale of E3 stock.

On appeal, the plaintiffs argue that the Court of Chancery should have found that the Stock Repurchase Agreements incorporate by reference the Settlement Agreement. If that is the case, the plaintiffs claim they can preserve their claims against the remaining defendants. If that argument fails, the plaintiffs fall back on the argument that their breach of fiduciary duty claims were personal and did not attach to the stock sold as part of the settlement. Finally, they argue that the unjust enrichment claims are independent of the breach of fiduciary duty claims.

We affirm the Court of Chancery's judgment. While the plaintiffs have an argument that the parties intended to treat the three agreements as a unitary transaction through incorporation by reference, that argument does not get them home. The Settlement Agreement's Release Carve Out conflicts with the complete transfer of all right, title, and interest in the plaintiffs' E3 stock under the Stock Repurchase Agreements. In the event of a conflict, the Stock Repurchase

4

Agreements plainly state that their terms control. The plaintiffs' remaining claims were also part of the rights accompanying the E3 stock sale, meaning the plaintiffs no longer had standing to bring these claims. Finally, like the plaintiffs' breach of fiduciary duty claims, the unjust enrichment claim traveled with the E3 stock when repurchased by E3.

## I.

## A.

According to the allegations in the complaint, in 2014, Jonathan Urdan and non-party Kevin Kurka co-founded E3.[1] E3 operates as a financial intermediary in the nascent property-assessed, clean-energy ("PACE") financing industry.[2] Urdan acted as E3's president and Chief Financial Officer. Kurka was its Chief Executive Officer. William Woodward was the first outside investor (Urdan and Woodward are referred to as the "plaintiffs").

---

[1] We take the essential facts from the Court of Chancery's opinion in *Urdan v. WR Capital Partners, LLC*, C.A. No. 2018-0343-JTL, 2019 WL 3891720 (Del. Ch. Aug. 19, 2019).

[2] As explained by the Court of Chancery,

> In a PACE financing arrangement, a financial intermediary like the Company partners with a local municipality to loan homeowners money for energy-saving improvements, and the homeowners repay the loans through additional tax assessments added to their property tax bills. The municipality authorizes the financial intermediary to assess the value of the improvements and collect the property taxes. The municipality also authorizes the financial intermediary to issue bonds backed by the property tax assessments. The financial intermediary uses proceeds from the bond issuances to fund the loans to homeowners.

*Id.* at *1.

Urdan, Kurka, and Woodward were all members of E3's board of directors (the "Board") and owned 100% of its equity. Defendant WR Capital Partners, LLC, is a private equity fund based in Morristown, New Jersey. Defendants Henri Talerman and Frank E. Walsh III manage WR Capital (the "WR Capital Defendants").

In early 2016, Talerman and Walsh approached Urdan, Kurka, and Woodward about investing in E3. They eventually agreed on a financing arrangement (the "2016 Financing"). The 2016 Financing included a loan agreement (the "Loan Agreement") for a $5 million revolving credit line between E3 and WR Capital's wholly-owned subsidiary, WR E3 Holdings, LLC ("WR Sub"). E3 could only draw on the credit line in increments of at least $100,000. Interest accrued at 10% per year. In exchange, Urdan, Kurka, and Woodward gave WR Capital a first priority security interest in their E3 equity interest.

Under the Loan Agreement E3 could not raise outside capital or enter into significant corporate transactions without WR Sub's prior written consent. WR Sub could also immediately call the extended credit if any enumerated "Events of Default" occur, which included either Urdan or Kurka being terminated for cause. E3 issued a warrant to WR Sub authorizing the purchase of up to 2,307,000 shares of E3 stock at $0.01 per share, exercisable in proportion to the amount drawn on the credit facility. In total, the warrant would represent 31% of E3's fully diluted equity.

6

The Loan Agreement also included an option whereby WR Sub could, in its sole discretion, increase the credit facility by up to $3 million. If fully exercised, the option would entitle WR Sub to an additional 379,034 shares—bringing the total number of shares available under the warrant to 34% of the Corporation's fully diluted equity. Further, WR Sub paid $500,000 to purchase 301,979 shares of Series B Preferred stock—reflecting a $1.65 per share purchase price—which was convertible into common stock. Finally, the 2016 Financing expanded the Board to five seats. WR Sub appointed Talerman and Walsh to the new Board seats.

In 2016, one of E3's wholly-owned subsidiaries borrowed $75 million from Oaktree Capital Management. The loan was secured by all of E3's assets and a pledge of all of the plaintiffs' and WR Sub's E3 stock. Beginning in early 2017, WR Capital issued "New Governance and Operating Procedures" specifying how Kurka—the Corporation's CEO—had to conduct business.[3] WR Capital refused to approve any draws under the Loan Agreement until Kurka agreed to the procedures. Thereafter, WR Capital terminated Kurka for cause. This effectively permitted WR Capital to block any Board action. The following month, WR Capital hired Bradley D. Knyal as CEO. WR Capital negotiated Knyal's employment terms without Board

---

[3] *Id.* at *3.

involvement and installed Knyal as CEO without complying with the Corporation's bylaws.

At this time, WR Capital represented one-half of E3's Board, exercised control of the day-to-day operations through Knyal, and remained E3's sole source of cash. WR Capital could reject requests for third-party financing and use its governance rights to block the Corporation from pursuing strategic alternatives.

By mid-2017, Talerman claimed E3 was short on cash, risked missing payroll, and faced the prospect of bankruptcy. Although WR Capital could, under the 2016 Financing, extend E3 $3 million in credit in exchange for warrants to purchase 379,034 shares, instead WR Capital offered a new $3 million revolving credit line in exchange for warrants for 8,524,478 shares (the "2017 Financing") and the right to fill three Board seats.

The 2017 Financing valued the Corporation at $4 million. Months later, after taking control of E3, WR Capital would seek new financing at a proposed value of $30-50 million. Around this time, a prospective third-party investor also proposed a $60 million valuation. Instead of negotiating the financing terms, Talerman threatened that WR Sub would declare an Event of Default for Kurka's termination, accelerate all debt obligations, and exercise the right to levy all of the plaintiffs' equity if the plaintiffs did not capitulate. The plaintiffs were forced to agree to the 2017 Financing.

Following the closing of the 2017 Financing, WR Capital fired E3's longstanding outside counsel and notified Urdan that his employment would end on May 31, 2018. WR Capital caused E3 to enter into another round of financing (the "2018 Financing") that WR Capital sponsored. Oaktree and Knyal could participate as co-sponsors. In exchange for incremental credit of $2.5 million, the sponsors received more E3 stock (the "2018 Capital Raise").

B.

The plaintiffs filed an eight-count lawsuit in May 2018. Two counts are pertinent here: breach of fiduciary duty claims against WR Capital, WR Sub, Talerman, and Walsh for the 2017 Financing, 2018 Financing, and the 2018 Capital Raise (Count I), and unjust enrichment against the same defendants for the 2017 Financing (Count VII). While the lawsuit was pending, E3 recapitalized by bringing in another investment fund. The new capital raise led to a partial settlement of the litigation through three agreements—a Settlement Agreement and Release, and two Stock Repurchase Agreements. The two Stock Repurchase Agreements are substantively identical.

In the Settlement Agreement, the plaintiffs released their claims against Knyal and E3, but carved out from the release the claims that they raised against the WR Capital Defendants. Like the Settlement Agreement, the Stock Repurchase

9

Agreements were integrated agreements, but did not contain a carve out. Instead, the plaintiffs sold "all of Seller's right, title and interest" in their stock to E3.

After the parties signed the three agreements, the Court of Chancery granted the WR Capital Defendants' motion to dismiss all counts of the complaint. Because the plaintiffs have only appealed the dismissal of Count I for breach of fiduciary duty and Count VII for unjust enrichment, we will focus on those claims. The Court of Chancery held that, under the Stock Repurchase Agreements, the plaintiffs no longer had standing to bring those claims once they transferred "all . . . right, title, and interest" in their stock to E3 through the Stock Repurchase Agreements.[4] As the court found, the plaintiffs' fiduciary duty and unjust enrichment claims followed the E3 stock with the sale to E3. Further, the court held that the plaintiffs could not import the Settlement Agreement's Release Carve Out into the Stock Repurchase Agreements because the Settlement Agreement was not incorporated by reference into those agreements. And, according to the court, even if they did, the Stock Repurchase Agreements and their complete transfer of rights trumped the inconsistency created by the reservation of rights in the Release Carve Out. The court also dismissed the unjust enrichment claim because it was duplicative of the dismissed breach of fiduciary duty claims and also traveled with the sale of the plaintiffs' E3 stock.

---

[4] App. to Opening Br. at A507 (Stock Repurchase Agreement § 1.01).

II.

On appeal, the plaintiffs argue that the Court of Chancery erred in three respects. First, the court should have found that the Settlement Agreement's Release Carve Out was incorporated by reference in the Stock Repurchase Agreements, meaning that the fiduciary duty and unjust enrichment claims were carved out of the plaintiffs' transfer of all "right, title, and interest" in their stock sold to E3. As they argue, the court failed to give sufficient weight to references to the Settlement Agreement in the recitals and substantive provisions of the Stock Repurchase Agreements. Second, regardless of the lack of the Release Carve Out in the Stock Repurchase Agreements, their breach of fiduciary duty and unjust enrichment claims were direct, not derivative, and thus were personal to the plaintiffs and did not travel with the E3 stock sale. Finally, the plaintiffs contend that the court should not have dismissed their unjust enrichment claim because the claim was independent of their breach of fiduciary duty claims.

We review questions of law, including contract interpretation, *de novo*.[5] Likewise, "[w]e review rulings on motions to dismiss pursuant to Rule 12(b)(6) . . . *de novo*."[6]

---

[5] *Salamone v. Gorman*, 106 A.3d 354, 367 (Del. 2014).
[6] *Ramirez v. Murdick*, 948 A.2d 395, 399 (Del. 2008).

11

A.

Under the Stock Repurchase Agreements, the plaintiffs sold all "right, title, and interest" in their E3 stock "subject to the terms and conditions" of those agreements.[7] The Stock Repurchase Agreements did not reserve any claims against the WR Capital Defendants. In the Settlement Agreement the parties agreed to a broad release, but carved out claims they wanted to continue to pursue against the WR Capital Defendants:

> Nothing in this [Settlement] Agreement shall affect any claims any of the Delaware Plaintiffs may have against any of the WR Parties or the defenses or counterclaims that any of the WR Parties may have to the claims of the Delaware Plaintiffs. Nothing in the releases contemplated by this Agreement shall release any claims that any of the Delaware Plaintiffs has asserted or may assert against any of the WR Parties, whether derivative or otherwise . . . .[8]

The plaintiffs argue for incorporation by reference of the Settlement Agreement and its Release Carve Out into the Stock Repurchase Agreements. Because the Stock Repurchase Agreements did not expressly incorporate the Settlement Agreement by reference, the first question on appeal is whether we should imply incorporation by reference. The Court of Chancery found to the contrary, and held that mere reference to the Settlement Agreement in the Stock Repurchase Agreements was insufficient to support incorporation by reference.

---

[7] App. to Opening Br. at A507 (Stock Repurchase Agreement § 1.01).
[8] *Id.* at A494 (Settlement Agreement § 10).

The background of the overall settlement lends some support for incorporation by reference. To state the obvious, the plaintiffs wanted to settle with some defendants but preserve their claims against the non-settling WR Capital Defendants. Otherwise, they would have agreed to dismiss the litigation against all of the defendants as part of the settlement. The three agreements were also executed together, by the same parties, and as part of the plaintiffs' sale of E3 stock.

Further, the Stock Repurchase Agreements contain provisions that might imply an intent to treat the three agreements as a unitary transaction. While mere reference to related contracts in a larger transaction is typically insufficient to prove incorporation by reference,[9] the Stock Repurchase Agreements contain several references that might lead to this result. In the fourth recital, the parties acknowledged that they were "concurrently" with the Stock Repurchase Agreements entering into the Settlement Agreement releasing certain claims.[10] In Section 8.06 of the Stock Repurchase Agreements, the parties referred to all three agreements, and characterized them as one agreement:

> This Agreement, the Settlement Agreement, the [other Repurchase] Agreement and the documents to be delivered hereunder and thereunder constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.[11]

---

[9] *Town of Cheswold v. Cent. Del. Bus. Park*, 188 A.3d 810, 819 (Del. 2018).
[10] App. to Opening Br. at A507 (Stock Repurchase Agreement).
[11] *Id.* at A516–17 (Stock Repurchase Agreement § 8.06).

13

In any event, while the plaintiffs have offered some support for incorporation by reference, we must still interpret the contracts as written and not as hoped for by litigation-driven arguments.[12]  Even if the Stock Repurchase Agreements incorporate the Settlement Agreement by reference, the Stock Repurchase Agreements' conflict resolution provisions defeat the plaintiffs' claims.

As noted earlier, the Stock Repurchase Agreements provide that the plaintiffs sold all "right, title, and interest" in their stock to E3.  We assume for now that all "right, title, and interest" in E3 stock includes the rights to claims that the plaintiffs wanted to continue to assert against the WR Capital Defendants.  The Settlement Agreement's Release Carve Out—where the plaintiffs carved out from the Settlement Agreement the claims against the WR Capital Defendants—conflicts with the transfer of all "right, title, and interest" in E3 stock under the Stock Repurchase Agreements.  When a conflict in terms occurs, Section 8.06 of the Stock Repurchase Agreements expressly provides that inconsistencies are resolved in favor of the terms in the Stock Repurchase Agreements.[13]  In other words, the

[12] *Heartland Payment Sys., LLC v. InTEAM Assocs., LLC*, 171 A.3d 544, 557 (Del. 2017) (explaining that even if the background of the transaction supports a particular interpretation, we must review "the transaction agreements to decide whether the arguments developed during litigation are supported by the specific language of the transaction agreements").

[13] App. to Opening Br. at A517 (Stock Repurchase Agreement § 8.06); *see Karish v. SI Int'l, Inc.*, 2002 WL 1402303, at *3 (Del. Ch. June 24, 2002) (explaining when "[t]he documents themselves provide the solution [in the event of conflict]" then "[t]his provision has clear application to the potential for conflict" by having primacy over the other agreements).  Like the Court of Chancery, the parties have assumed on appeal that the conflict resolution provision in the Stock Repurchase

Release Carve Out yields to the transfer of all of plaintiffs' "right, title, and interest" in the E3 stock.

The plaintiffs argue that the lead-in language to Section 1.01 of the Stock Repurchase Agreements—the sale of all "right, title, and interest" of E3 stock is "subject to the terms and conditions set forth herein"—means that if the Settlement Agreement Release Carve Out is incorporated by reference, it becomes one of the "terms and conditions set forth herein." We think this argument stretches the incorporation by reference doctrine too far. The word "herein" refers to the Stock Repurchase Agreements' terms, not the Settlement Agreement.[14] And the Release Carve Out is limited to the release in the Settlement Agreement. This is consistent with other limitations stated in the Settlement Agreement, whose terms apply only to the Settlement Agreement.[15]

The plaintiffs also argue that failing to harmonize the Settlement Agreement's Release Carve Out and the Stock Repurchase Agreements renders the Release Carve

---

Agreements applies to conflicts between the Settlement Agreement and the Stock Repurchase Agreements.

[14] *See* App. to Opening Br. at A516 (Stock Repurchase Agreement § 8.06) (distinguishing between documents delivered "hereunder" from those delivered "thereunder").

[15] *See id.* at A489 (Settlement Agreement) ("WHEREAS, the Parties have determined to resolve the claims against certain Parties, while preserving claims against other Parties . . . all on the terms set forth herein . . . ."); *id.* at A489–90 (Settlement Agreement § 1) ("The closing under this [Settlement] Agreement . . . is dependent upon closings under both the [Stock Repurchase Agreements] taking place. Accordingly, the provisions set forth in Sections 3-11 of this [Settlement] Agreement shall be effective upon the closing under the [Stock] Repurchase Agreements."); *id.* at A490 (Settlement Agreement § 2) ("As conditions to this [Settlement] Agreement, (i) Jonathan Urdan . . . [and] (ii) the Woodward Parties shall sell to [E3] all of their interests in common stock of [E3] and Series A Preferred Stock of [E3] . . . .").

Out surplusage. Rendering terms surplusage is not preferred.[16] But the hard reality here is that the three agreements do not fit together. We will not torture or twist words or imply terms to make square pegs fit into round holes.[17] And unlike other cases where surplusage might be avoided, the parties in the Stock Repurchase Agreements specifically contracted for what happens in the event of conflict. The parties agreed that the Stock Repurchase Agreements' terms control.

Thus, we agree with the Court of Chancery that even if the Release Carve Out is incorporated by reference in the Stock Repurchase Agreements, it yields to the transfer of the plaintiffs' entire "right, title, and interest" in their E3 stock. As we discuss next, along with the sale of all "right, title, and interest" in E3 stock went the claims against the remaining WR Capital Defendants.[18]

B.

As noted earlier, to this point we have assumed that the sale of the plaintiffs' "right, title, and interest" in E3 stock included the right to assert the claims against the WR Capital Defendants. The plaintiffs concede that with the E3 stock sale they

---

[16] *See, e.g., Sonitrol Hldg. Co. v. Marceau Investissements*, 607 A.2d 1177, 1183 (Del. 1992) ("Under general principles of contract law, a contract should be interpreted in such a way as to not render any of its provisions illusory or meaningless.").

[17] *See Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992) ("Absent some ambiguity, Delaware courts will not destroy or twist policy language under the guise of construing it.").

[18] For the first time on appeal the plaintiffs have argued that ambiguity exists and we should reverse to allow the Court of Chancery to consider extrinsic evidence of the parties' intent. The ambiguity argument was not raised below and is therefore waived. Supr. Ct. R. 8.

lost standing to pursue derivative claims. But they argue that their breach of fiduciary duty claims for economic dilution are direct claims. If this is so, they contend, their direct claims were personal and did not follow the E3 stock sale. We agree with the Court of Chancery, however, that their economic dilution claims, whether direct, derivative, or both, followed the E3 stock sale and the plaintiffs could no longer pursue those claims.

In general, "a purchaser of a certificated or uncertificated security acquires all rights in the security that the transferor had or had power to transfer."[19] "The phrase 'all rights in the security' can be understood as distinguishing between personal rights of the holder, on the one hand, and rights that inhere in the security itself, on the other."[20] The rights in the security are rights "arising from the relationship among stockholder, stock and the company."[21] Rights that are personal to the security holder, however, do not travel with the sale of a security.[22] The distinction between rights in the security and personal rights is best illustrated by examples. A corporate charter violation claim travels with a stock sale because the injury "is to

---

[19] 6 *Del. C.* § 8-302(a).

[20] *In re Sunstates Corp. S'holder Litig.*, 2001 WL 432447, at *3 (Del. Ch. Apr. 18, 2001).

[21] *I.A.T.S.E. Local No. One Pension Fund v. Gen. Elec. Co.*, 2016 WL 7100493, at *5 (Del. Ch. Dec. 6, 2016).

[22] *In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1050 (Del. Ch. 2015) ("When a share of stock is sold, the property rights associated with the shares, including any claim for breach of those rights and the ability to benefit from any recovery or other remedy, travel with the shares.").

the stock and not the holder."[23]  A "claim relating to the fairness of the then-proposed transaction passed to [the] purchaser, who enjoyed the benefits of the settlement."[24] And a challenge to executive compensation awards that violated the terms of a stockholder-approved compensation arrangement travels with the stock.[25]  The common thread running through these claims is the close relationship between the stock and the claims asserted.  The rights are more than just incidental to the ownership of stock.

In contrast, personal claims do not depend on the relationship between the stockholder and the corporation or the existence of an underlying security.  As the Vice Chancellor explained in *In re Activision Blizzard, Inc. Stockholder Litigation*:

> Quintessential examples of personal claims would include a contract claim for breach of an agreement to purchase or sell shares or a tort claim for fraud in connection with the purchase or sale of shares.  One major distinction between these types of claims and the Delaware corporate law claims discussed previously is that for the personal claims, the nature of the underlying property does not matter.  The property happens to be shares, but the cause of action is not a property right carried by the shares, nor does it arise out of the relationship between the stockholder and the corporation.  For the breach of contract claim, the cause of action arises out of the contract between the buyer and the seller.  For the fraud claim, the cause of action arises out of the false representations made by the buyer or seller on which the counterparty relied to her detriment, suffering causally related damages

---

[23] *Schultz v. Ginsburg*, 965 A.2d 661, 667 (Del. 2009).
[24] *In re Prodigy Commc'ns Corp. S'holders Litig.*, 2002 WL 1767543, at *4 (Del. Ch. July 26, 2002).
[25] *See Noerr v. Greenwood*, 2002 WL 31720734, at *4 (Del. Ch. Nov. 22, 2002).

as a consequence. The underlying property could just as easily be land or a car.[26]

Here, the plaintiffs essentially claim that the WR Capital Defendants breached their fiduciary duties by approving financing transactions that diluted the plaintiffs' equity interest in E3. A breach of fiduciary duty claim for dilution is not a wrong personal to the stockholder. It arises from "the relationship among stockholder, stock and the company."[27] Whether described as direct, derivative, or both, the dilution claims were not personal to the plaintiffs and traveled with the sale of their E3 stock.

The plaintiffs rely on our decision in *Shultz v. Ginsburg*.[28] In *Shultz*, we affirmed the Court of Chancery's holding that shareholders who divested their stock prior to the close of a transaction, but held their interest when the transaction was approved, could share in the proceeds of the settlement.[29] When referring to an admission made by one of the parties, we characterized a dilution claim as personal to the stockholder:

> As a matter of law, a Charter Violation claim transfers to a later purchaser because the injury is to the stock and not the holder. Therefore, under a Charter Violation claim, the Buyer would suffer the injury. Conversely, and as Ginsberg admitted, the Economic Dilution claim was personal. Thus, under an Economic Dilution claim, the claim

---

[26] *In re Activision*, 124 A.3d at 1056.
[27] *I.A.T.S.E.*, 2016 WL 7100493, at *5.
[28] 965 A.2d 661 (Del. 2009).
[29] *Id.* at 667.

19

for damage suffered would remain with the Seller and not transfer to the Buyer.[30]

The language from our *Schultz* opinion has caused some confusion in later cases.[31] The Court of Chancery has respectfully attempted to distinguish *Schultz*, but a plain reading of the decision shows that the admission it relied upon is inconsistent with the nature of a dilution claim. Thus, we overrule that part of the decision and clarify that dilution claims, whether direct, derivative, or a combination of the two, are not claims personal to the stockholder.

The plaintiffs raise two other arguments to support their contention that their breach of fiduciary duty claims are personal. First, the plaintiffs argue that their fiduciary duty claims "are even more clearly personal than the claims in *Schultz* because the breaches were committed by a controller against a shareholder minority."[32] In support, the plaintiffs cite cases holding that "claims for breach of fiduciary duty that arise from a controller's breach of duty against a minority are more personal in nature because the harm suffered by the minority is different than the harm suffered by the corporation."[33] This argument confuses the personal nature of a claim with whether a claim is direct or derivative. While we have recognized

---

[30] *Id.* at 667–68 (footnote omitted).

[31] *See In re Activision*, 124 A.3d at 1055; *In re Celera Corp. S'holder Litig.*, 2012 WL 1020471, at *14 & n.83 (Del. Ch. Mar. 23, 2012), *aff'd in part, rev'd in part on other grounds*, 59 A.3d 418 (Del. 2012).

[32] Opening Br. at 39.

[33] *Id.* at 40.

in unique circumstances dilution might give rise to dual-natured claims,[34] whether a claim is personal depends on whether the claim is properly viewed as a property right inherent in the stock as opposed to a wrong that belongs personally to the former stockholder.

Second, the plaintiffs note that their shares were not sold into a market, but rather back to E3, which "is closely-held" and has "no public 'market' [to] reflect[] the value of [the plaintiffs'] shares in light of pending or prospective lawsuits."[35]  It is true that some dilution claims have been considered personal because in select situations—such as a coerced sale to avoid dilution or a squeeze-out merger that involuntarily separates the stockholder from its stock and dilutes that stockholder in the process—the stock itself either ceases to exist or is not essential to the wrong.[36] In other words, the harm is to the stockholder, not the stock itself.  Here, however, the plaintiffs are not like a stockholder coerced to sell stock to avoid dilution in public markets or frozen out of the corporation by operation of a transaction.[37]  The

---

[34] *See El Paso Pipeline GP Co.*, *L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1262 (Del. 2016) ("In unique circumstances, this Court has recognized that some claims can be dual-natured—that is, both direct and derivative.").

[35] Reply Br. at 18.

[36] *See I.A.T.S.E.*, 2016 WL 7100493, at *6 ("Unlike *Activision*, the Plaintiff did not choose to sell its [company] stock, and nothing in the record indicates that the market into which the Plaintiff sold its new GE Preferred valued the potential breach-of-duty claim in the price of the stock."); *see also In re Sunstates*, 2001 WL 432447, at *3 n.11 ("The legal rights of the parties are well enough understood to be reflected in the way the markets deal with the trading of shares as to which a dividend has been declared . . . . The buyer knows this and pays a price that reflects that fact.").

[37] The Court of Chancery made the same distinction. *See Urdan*, 2019 WL 3891720, at *11 ("If the plaintiffs had been deprived of their shares by merger, then that distinction would matter,

plaintiffs could have held onto their shares and maintained their lawsuit, or by agreement transferred less than the entire bundle of rights that are part of the securities sold. Instead, when the plaintiffs voluntarily relinquished those shares, absent an agreement to the contrary, the plaintiffs "sever[ed] their economic relationship with the corporation during the litigation."[38] With the sale of E3 stock went the rights to continue to pursue dilution claims.

C.

In the plaintiffs' complaint, they sought damages for unjust enrichment "[a]s an alternative theory of recovery" for breach of fiduciary duty, fraudulent inducement, and fraudulent concealment.[39] Specifically, the plaintiffs alleged that "WR Capital expressly represented that it would take up to 379,034 more warrants upon exercising the $3 million option to increase its credit facility to E3" as memorialized in the May 2016 lending transaction.[40] By exploiting its control and leveraging the Corporation's need for capital, "WR Capital amended the deal terms, demanding and receiving 8,524,478 warrants for extending $3 million in credit to

---

because the plaintiffs could challenge the transaction that deprived them involuntarily of their property rights. But in this case, the plaintiffs sold their shares voluntarily.").

[38] *In re Triarc Cos*., *Inc*. *Class & Deriv*. *Litig*., 791 A.2d 872, 879 (Del. Ch. 2001); *In re Prodigy*, 2002 WL 1767543, at *4 (holding that sale of "shares in the marketplace" "severed [the] economic relationship with [the company]" and thus, "the claim relating to fairness of the then-proposed transaction passed to [the] purchaser, who enjoyed the benefits of the settlement").

[39] App. to Opening Br. at A062–63 (Compl. ¶¶ 149–50).

[40] *Id.* at A063 (Compl. ¶ 151).

E3."[41]  This, the plaintiffs claim, "unjustly enriched WR Capital" at the plaintiffs' expense and WR Capital leveraged threat of an Event of Default under the loan agreement to coerce the plaintiffs to accept the demand.[42]  Accordingly, "WR Capital's actions deprived [the plaintiffs] of their rights and caused injury to them . . . . [and] unlawfully diluted [the plaintiffs] and unjustly enriched WR Capital."[43]

The Court of Chancery found that the plaintiffs' unjust enrichment claims were "the same theory that the plaintiffs seek to litigate through their claims for breach of fiduciary duty and breach of contract."[44]  According to the court, where either theory has a parallel, duplicative unjust enrichment claim, "it is typically dismissed in favor of the . . . more settled doctrine" the court found that "permitting the [unjust enrichment] theory to proceed would upset the settled outcomes generated by the established legal frameworks."[45]  The court also held that the unjust enrichment claim depended on the plaintiffs' stockholder status, whether derivative or direct, because the detriment affected E3 or the plaintiffs' stock.  Thus, the plaintiffs forfeited not only derivative standing, but also "gave up their ability to assert a direct claim for dilution when they sold their shares, [and] they likewise gave up a parallel claim for unjust enrichment based on harm to their shares."[46]

---

[41] *Id.* (Compl. ¶ 152).
[42] *Id.*
[43] *Id.* (Compl. ¶ 153).
[44] *Urdan*, 2019 WL 3891720, at *20.
[45] *Id.*
[46] *Id.* at *21.

On appeal, the plaintiffs argue that their unjust enrichment claims should survive because they could pursue their breach of fiduciary duty claims. That is no longer the case. The plaintiffs have also run head on into established law that an unjust enrichment claim should be dismissed if it duplicates a breach of fiduciary duty claim.[47] To get around this roadblock, the plaintiffs argue that their unjust enrichment claim is not dependent on a breach of the Loan Agreement. Instead, it centers on improper threats and coercion that forced them to agree to the new 2017 Financing. Thus, "[t]he contract itself is not necessarily the measure of [the] plaintiff's right where the claim is premised on an allegation that the contract arose from wrongdoing (such as breach of fiduciary duty or fraud) or mistake and the [defendant] has been unjustly enriched by the benefits flowing from the contract."[48] Stated differently, the plaintiffs allege "it is the [contract], itself, that is the unjust enrichment."[49]

We need not wrestle with their nuanced pleading argument because the Court of Chancery's alternative holding provides a straightforward path to affirm dismissal of the claim. Like the plaintiffs' breach of fiduciary duty claims, their unjust enrichment claims arise from their stock ownership and its relationship to E3. We

---

[47] *Gamco Asset Mgmt. Inc. v. iHeartMedia Inc.*, 2016 WL 6892802, at *19 (Del. Ch. Nov. 23, 2016), *aff'd*, 172 A.3d 884 (Del. 2017) (TABLE).

[48] *RCS Creditor Tr. v. Schorsch*, 2018 WL 1640169, at *7 (Del. Ch. Apr. 5, 2018) (alteration in original) (citation omitted).

[49] *Id.* (alteration in original) (quoting *McPadden v. Sidhu*, 964 A.2d 1262, 1276 (Del. Ch. 2008)).

agree with the Court of Chancery that, "[j]ust as they gave up their ability to assert a direct claim for dilution when they sold their shares, they likewise gave up a parallel claim for unjust enrichment based on harm to their shares."[50]

## III.

The judgment of the Court of Chancery is affirmed.

---

[50] *Urdan*, 2019 WL 3891720, at *21.